MASSACHUSETTS TEACHERS ASSOCIATION & another[1] vs.
SECRETARY OF THE COMMONWEALTH & others[2]
(and two companion cases[3]).

Suffolk. May 4, 1981. — August 4, 1981.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Taxation*, Limitation, Real estate, Excise tax, Income tax. *Constitutional Law*, Initiative, Taxation, Equal protection of laws. *Proposition 2½.*

The various provisions of an initiative measure which set limitations on local tax assessments, limited assessments for the motor vehicle excise, permitted a State income tax deduction of one-half of the rent paid for one's residence, limited the permissible level of municipal charges for

---

[1] The Massachusetts Teachers Association (MTA) is a Massachusetts corporation. The other plaintiff, Roland Lachance, is a taxpayer, home owner, voter, and a public school teacher.

[2] The MTA's amended complaint lists the following State defendants: the Secretary of the Commonwealth, the Auditor of the Commonwealth, and the Commissioner of Revenue. It also names the city manager, the collector of taxes and treasurer, and the board of assessors of the city of Cambridge. The Cambridge defendants have not participated in the proceedings before this court.

The State defendants in this action and in the other two actions are represented by the Attorney General. We shall on occasion refer to arguments advanced on behalf of the State defendants as arguments of the Attorney General.

[3] In one of the other cases, the plaintiffs are the executive director, president, and treasurer, as individuals, officers, and representatives of the Massachusetts Coalition of Police, AFL-CIO. The Commissioner of Revenue is the only defendant.

In the third action, the plaintiffs are the International Brotherhood of Police Officers, the International Brotherhood of Correctional Officers, and five individuals who are citizens, voters, and taxpayers. The defendants are the same three State defendants named in the MTA action and the Treasurer of the Commonwealth, the Joint Labor-Management Committee (see St. 1979, c. 154, § 1, amending St. 1977, c. 730, § 1, as it inserted § 4A in St. 1973, c. 1078), and the Board of Conciliation and Arbitration (see St. 1973, c. 1078, § 4).

goods or services, and otherwise indirectly affected the amount of taxes to be collected by giving authority to municipalities to control expenditures or by restraining the Commonwealth and certain political subdivisions from imposing costs on cities and towns were sufficiently related directly or indirectly to the limitation of State and local taxation to constitute "related subjects" as required by art. 48, The Initiative, II, § 3, of the Amendments to the Constitution of the Commonwealth. [218-221]

A provision of an initiative petition that would have different consequences in various municipalities depending on whether a municipality's assessments were more or less than 2½% of the full and fair cash valuation of real and personal property in the municipality was not "restricted . . . to particular districts or localities" so as to require its exclusion from the initiative process under art. 48, The Initiative, II, § 2, of the Amendments to the Constitution of the Commonwealth. [222-225]

A provision of an initiative petition which would eliminate the fiscal autonomy of school committees and the concomitant right judicially to enforce that autonomy was not excluded from the initiative process under art. 48, The Initiative, II, § 2, of the Amendments to the Constitution of the Commonwealth as a measure relating "to the powers . . . of courts" or to a constitutional "right of access to and protection in courts of justice." [225-226]

The exercise of discretion by the Attorney General in preparing a summary of an initiative proposal, as required by art. 48, The Initiative, II, § 3, and art. 48, General Provisions, III, is to be given weight in any judicial analysis of the fairness and adequacy of a summary. [229-230]

A statement in a summary of an initiative proposal that "[t]he proposal would limit the amount of money required to be appropriated for public schools to that amount voted upon by the local appropriating authority" was a concise and fair summary of provisions of the proposal which would eliminate the fiscal autonomy of school committees and the right to enforce judicially that autonomy. [231]

The Attorney General's failure to mention in the summary of an initiative proposal a provision giving a municipality the right to revoke acceptance of certain General Laws it had previously accepted was the omission of a minor subject where the proposal contained numerous provisions aimed at setting limitations on State and local taxation and where the Legislature had already passed a provision similar to that omitted from the summary. [231-232]

A provision of an initiative proposal which would authorize a municipality, by vote of a majority of those voting, to reduce the statutory limit on the assessment of local property taxes to a rate below 2½% was not a major change in the law in relation to the provisions of the

proposal considered as a whole, and the Attorney General's omission of any reference to that provision from the summary of the proposal was reasonable. [232]

In the absence of a successful challenge to the constitutionality of the provisions of an initiative measure, this court declined to analyze the propriety of the omission from the Attorney General's summary of a reference to the measure's severability clause. [233]

An error in the Attorney General's summary of an initiative proposal was considered minor and not significantly misleading where the error would have had a limited, not a Statewide, influence on voters and where the summary was not the only source of voter information on the widely debated proposal. [233-236]

Where an initiative proposal, as originally submitted, erroneously provided for the repeal of § 4A of St. 1973, c. 1078, rather than § 4, but the Attorney General's summary had stated that the proposal would "repeal the law which provides for compulsory binding arbitration when labor negotiations concerning police and fire personnel come to an impasse," as was intended by the proponents of the proposal and consistent with repeal of § 4, the Attorney General's conclusion that a subsequent change in the proposal to substitute a reference to § 4 for the reference to § 4A was a "perfecting" amendment permitted by art. 48, The Initiative, V, § 2, was reasonable even though the change was more than a technical adjustment. [236-238]

The provision of an initiative measure which permitted, for State income tax purposes, a deduction from taxable income of 50% of the rent paid by an individual for his principal place of residence in the Commonwealth did not violate equal protection of the laws provisions of the Fourteenth Amendment to the United States Constitution or comparable principles expressed in the Constitution of the Commonwealth in its distinction between residential renters and nonrenters. [239-240]

The provision of an initiative measure which permitted, for State income tax purposes, a deduction from taxable income of 50% of the rent paid by an individual for his principal place of residence in the Commonwealth was reasonably justified under art. 44 of the Amendments to the Constitution of the Commonwealth by the untaxed benefit a home owner receives in the use of his home and, therefore, did not violate the requirement of uniformity of rates of taxation set forth in art. 44. [241-245]

Two CIVIL ACTIONS commenced in the Supreme Judicial Court for the county of Suffolk on November 13, 1980, and November 17, 1980, respectively.

CIVIL ACTION commenced in the Superior Court Department on November 26, 1980.

Upon transfer of the first two actions to the Superior Court Department, all three cases were heard by *Young*, J., and were reported by him to the Appeals Court. The Supreme Judicial Court granted a request for direct review.

*Robert J. Muldoon, Jr., & Peter J. McCue* for Massachusetts Teachers Association & another.

*Mark J. Dalton* (*Robert J. Canavan* with him) for International Brotherhood of Police Officers & others.

*Joseph G. Sandulli* for Massachusetts Coalition of Police, AFL-CIO.

*Donald K. Stern*, Assistant Attorney General (*James A. Aloisi, Jr.*, Assistant Attorney General, with him) for Secretary of the Commonwealth & others (*Russell B. Higley*, City Solicitor, for the city of Cambridge, with him).

*Paul J. McCarthy & Jeanne C. Farrah* for Massachusetts Police Association, amicus curiae, submitted a brief.

WILKINS, J. At the November, 1980, general election, acting under the initiative process of the Constitution of the Commonwealth, the voters adopted as chapter 580 of the Acts of 1980 a tax limitation measure commonly known as Proposition 2½.[4] The plaintiffs contend that Proposition 2½ was not a proper subject of an initiative petition and that procedural requirements of the initiative process authorized by the Constitution were not adequately followed in the presentation of Proposition 2½ to the voters. They also raise before us a challenge to the constitutionality

---

[4] The characterization of the initiative proposal as "Proposition 2½" is a blatant colloquialism. The word "proposition" is derived from a well-known tax limitation measure submitted to the people of California in 1978 as Proposition 13. In California, matters put to popular vote are characterized as propositions. In Massachusetts, we simply call them questions.

The reference to "2½" is not based on an offbeat numbering system. Proposition 2½ was in fact the second question on the 1980 ballot. The reason for the reference to "2½" is that the principal tax limitation feature of St. 1980, c. 580, is based on the initial objective of § 1 of the act to restrict most cities' or towns' total annual assessments against their real and personal property to 2½% of the fair cash value of that property.

We shall often use the expression "Proposition 2½" in this opinion to refer either to the proposal or to the act, as the case may be.

of a substantive provision of Proposition 2½, that is a challenge which could have been made if Proposition 2½ had been adopted by the Legislature rather than through the initiative process.[5]

These cases are before us on a report (see Mass. R. Civ. P. 64, 365 Mass. 831 [1974]) by a judge of the Superior Court of the propriety of his rulings, which (a) declared that Proposition 2½ was adopted in a constitutionally adequate manner according to the procedures set forth in art. 48 of the Amendments to the Constitution of the Commonwealth, as amended by art. 74 of the Amendments,[6] and (b) rejected the only substantive challenge to Proposition 2½ which the judge concluded was properly before him. We granted a request for an expeditious, direct appeal to this court. We agree with each of the judge's rulings challenged in this court.

## The Procedural Background

In resolving the issues that underlie the judge's rulings that have been reported for appellate consideration, it is not generally important to differentiate among the three actions brought to challenge Proposition 2½. Each was commenced shortly after the adoption of Proposition 2½, two in the Supreme Judicial Court for Suffolk County, and the third in the Superior Court, after a single justice of this court had transferred the first two actions to the Superior Court. It is sufficient to note that the actions were consolidated for pretrial purposes in the Superior Court. On December 8, 1980, the judge denied the plaintiffs' requests for preliminary injunctions against the implementation of Proposition 2½. Subsequently, each party moved for summary judgment or for partial summary judgment, and various affidavits were filed. On March 31, 1981, in a com-

---

[5] This substantive challenge is to the renter's deduction, a deduction allowed, in computing a renter's State income tax liability, of one-half of the rent paid for the taxpayer's principal residence.

[6] Unless otherwise indicated in this opinion, references to art. 48 are intended to refer to art. 48, as amended by art. 74.

prehensive and thoughtful memorandum, the judge allowed summary judgment in favor of the Commonwealth defendants and denied the plaintiffs' motions for summary or partial summary judgment. He stated that "[a] declaration will enter that St. 1980, c. 580 has been constitutionally adopted by the people of the Commonwealth and that its provisions are, on their face, constitutional." He then reported the propriety of his rulings to the Appeals Court.

The judge stated that he expressed no opinion whether Proposition 2½, "in its operation, will impair the obligation of contracts or deny to any of the citizens of the Commonwealth the equal protection of the laws." He had earlier concluded that the impairment of contract issue was not ripe for adjudication. No argument has been made here based on a claim of an unconstitutional impairment of the obligation of contracts or on the denial of equal protection of the laws in the application of Proposition 2½ in particular circumstances. In this opinion, we consider only those rulings of the judge that are argued in the plaintiffs' briefs filed in this court.

The judge dismissed the Massachusetts Coalition of Police, AFL-CIO, as a party plaintiff on the ground that it was an unincorporated association not capable of suing or being sued. Because there is at least one plaintiff who has standing to raise each of the issues argued to us, as the Attorney General grants, we do not pause to determine which particular plaintiff or plaintiffs are entitled to advance particular issues or whether the judge was correct in dismissing the Massachusetts Coalition of Police, AFL-CIO, as a party plaintiff. See *Save the Bay, Inc.* v. *Department of Pub. Utils.*, 366 Mass. 667, 674-675 (1975). The individual plaintiffs who are citizens and qualified voters have standing to argue that Proposition 2½ was not constitutionally adopted. See *Cohen* v. *Attorney Gen.*, 354 Mass. 384, 387 (1968) (qualified voters); *Sears* v. *Treasurer & Receiver Gen.*, 327 Mass. 310, 314-315 (1951) (citizens). At least one plaintiff is a home owner who has standing to raise the sub-

stantive constitutional challenge to the renter's income tax deduction allowed by Proposition 2½.[7]

### Proposition 2½

Proposition 2½ (St. 1980, c. 580) is entitled "An Act limiting state and local taxation and expenditures." Certain of its sections place limitations on the amount of tax or other revenue permitted to be collected. Thus, for example, the maximum motor vehicle excise payable to cities and towns is reduced from $66 to $25 per $1,000 of valuation. G. L. c. 60A, § 1, as amended by St. 1980, c. 580, § 9. Proposition 2½ grants a tax deduction in the calculation of a taxpayer's State income tax in an amount equal to one-half of the rent paid for his or her principal place of residence. G. L. c. 62, § 3 B (*a*) (9), inserted by St. 1980, c. 580, § 11. A somewhat different provision limits charges and fees for goods provided or services rendered by a city, town, or other governmental agency to the "cost of furnishing such goods or providing such services." G. L. c. 59, § 20A, inserted by St. 1980, c. 580, § 12.

Most significantly, Proposition 2½ places a limitation on the total taxes permitted to be assessed annually on a municipality's real or personal property. G. L. c. 59, § 21C, inserted by St. 1980, c. 580, § 1. The total annual assessments of most cities and towns may not exceed 2½ % of the full and fair cash valuation of their real and personal property, unless that percentage is increased by a two-thirds vote at a general election. G. L. c. 59, § 21C (1). See G. L. c. 59, § 21C (4). If a municipality exceeds 2½ % "on the effective date of the enactment of [§ 21C]," the municipality need not necessarily lower its total assessment to 2½ % immediately. It must reduce its assessments annually by not less than 15 % of the total taxes assessed in the fiscal year of that effective date until it reaches the level of 2½ % . G. L.

---

[7] The challenge to the renter's deduction is that the renter's deduction, on its face, violates equal protection of the laws principles and the specific requirements of the Constitution of the Commonwealth that taxes be uniform and proportionate. We discuss these questions at 239-245 below.

c. 59, § 21C (2). If a municipality's total assessments were less than 2½ % of the full and fair cash valuation of its property in fiscal year 1979, it must use that lesser percentage in lieu of 2½ %. G. L. c. 59, § 21C (3). There is also a provision limiting increases in tax assessments in each successive year to 2½ % of the preceding year's assessments but authorizing an increase in that percentage by a two-thirds vote at a general election. G. L. c. 59, § 21C (4). Also, the 2½ % limitation, or any other applicable percentage limitation, may be reduced in a city or town by a majority vote at a general election. G. L. c. 59, § 21C (5).

Other portions of Proposition 2½ are concerned with freeing cities and towns from expenditures mandated by State law. Thus, the fiscal autonomy of school committees is abolished (see G. L. c. 71, §§ 16B and 34, as amended by and appearing in St. 1980, c. 580, §§ 6 and 7 respectively), as is compulsory, binding arbitration of disputes involving a municipality and a collective bargaining representative of its police or firefighters (see St. 1980, c. 580, § 10). There are extensive provisions concerned with preventing the involuntary imposition on cities and towns of certain direct service or cost obligations resulting from statutes and administrative rules or regulations. See G. L. c. 29, § 27C, inserted by St. 1980, c. 580, § 2; G. L. c. 11, §§ 6 and 7, as appearing in and inserted by St. 1980, c. 580, §§ 3 and 4, respectively. There is also a limitation on counties' and other government entities' charges to cities and towns. See G. L. c. 59, § 20A, inserted by St. 1980, c. 580, § 12. Finally, Proposition 2½ authorizes cities and towns in certain circumstances to revoke their acceptance of certain provisions of the General Laws. See G. L. c. 4, § 4B, inserted by St. 1980, c. 580, § 5.

### The Initiative Process

We summarize, in a general way, those provisions of art. 48 that are of significance in considering the various challenges of the plaintiffs.

Article 48 requires that an initiative measure contain only subjects "which are related or which are mutually depend-

ent." Art. 48, The Initiative, II, § 3. The plaintiffs argue that the various provisions of Proposition 2½ are not related or mutually dependent and that consequently Proposition 2½ is invalid because it was enacted in violation of an express prohibition of art. 48.

Certain subjects are expressly excluded from the initiative process. Art. 48, The Initiative, II, § 2. No initiative measure may be proposed "the operation of which is restricted to a particular town, city or other political division or to particular districts or localities of the commonwealth." Id. The plaintiffs argue the special treatment given by G. L. c. 59, § 21C, to municipalities whose 1979 fiscal year assessments were less than 2½ % of assessed valuations violates the "particular localities" exclusion of art. 48. See G. L. c. 59, § 21C (3). Also excluded from enactment by initiative is any measure relating "to the powers . . . of courts" or to a constitutional "right of access to and protection in courts of justice." Art. 48, The Initiative, II, § 2. The Massachusetts Teachers Association (MTA) argues that the attempted abolition of the right to seek judicial enforcement of the fiscal autonomy of school committees is a subject that is excluded from the initiative process. See G. L. c. 71, § 34, as appearing in St. 1980, c. 580, § 7.

When an initiative petition is originated by ten qualified voters, it is submitted to the Attorney General, who must make certain determinations concerning the form and substance of the measure. Art. 48, The Initiative, II, § 3. He must, for example, determine whether the measure contains subjects that are related or mutually dependent and whether the measure contains only subjects not excluded from the popular initiative. Id. He is bound also to prepare, at this stage, a fair and concise summary of the proposed measure. This summary is to appear on the top of each blank used to obtain subsequent signatures in support of the measure, and it will appear on the ballot, if the measure is submitted to the people at a general election. Art. 48, The Initiative, II, § 3, and art. 48, General Provisions, III, Form of Ballot. The plaintiffs argue that the

summary prepared by the Attorney General was not fair and concise because it omitted certain matters covered by Proposition 2½ and because it contained a misstatement of the substance of one portion of Proposition 2½.

Finally, if the General Court fails to pass a proposed law within the time limits stated in art. 48, a majority of the first ten signers of the initiative petition may amend the measure, provided that, in the opinion of the Attorney General, the amendment is "perfecting in its nature and does not materially change the substance of the measure." Art. 48, The Initiative, V, § 2. The proponents of Proposition 2½ undertook to make an amendment after the General Court failed to pass the proposal. The Attorney General certified the amendment as meeting the requirements of a perfecting amendment, and, after further signatures were obtained, Proposition 2½ was submitted to the voters as thus amended. The plaintiffs in the action brought by the International Brotherhood of Police Officers argue that the amendment was not a perfecting amendment permitted by art. 48.

With this background, we turn to the various challenges to the judge's rulings argued before this court.

## Related Subjects

The plaintiffs argue strenuously that the presence of diverse provisions in Proposition 2½ violates the requirement of art. 48, The Initiative, II, § 3, that an initiative measure contain "only subjects . . . which are related or which are mutually dependent."[8] One group of plaintiffs contends that each of the substantive provisions of Proposition 2½ should have been presented separately. It is clear, however, that an initiative measure may include more than one subject. The constitutional requirement is only that those subjects be related.

[8] The Attorney General does not argue that any two or more of the subjects covered by Proposition 2½ are "mutually dependent." We need not pause to consider whether any subjects which are mutually dependent could ever be said not also to be related.

There has been little discussion in reported opinions concerning the "related subjects" limitation of art. 48. In *Opinion of the Justices*, 309 Mass. 555, 560-561 (1941), the Justices briefly discussed the question in terms of an initiative petition that sought to permit contraceptive advice to married persons. The proposed legislation additionally allowed the teaching of the subject in chartered medical schools as well as the publication and sale of medical treatises on such matters. The Justices concluded that "[t]he particular subjects of the proposed law appear to be germane to the general subject of prevention of pregnancy or conception, to such an extent, at least, that they cannot rightly be said to be unrelated." *Id.* at 561. The standard articulated in the *Opinion of the Justices* is the one we apply here: Whether the subjects dealt with in Proposition 2½ are germane to a general subject, at least to the extent that one cannot rightly say that they are unrelated.[9] Of course, the general subject of an initiative proposal cannot be so broad as to render the "related subjects" limitation meaningless. If, however, one can identify a common purpose to which each subject of an initiative petition can reasonably

---

[9] We find no reason to reject this standard based on the Debates in the Massachusetts Constitutional Convention, 1917-1918 (1918). As initially proposed to the convention, the initiative measure had no provision concerning related subjects. In the course of the debates, Mr. Luce of Waltham, expressing concern over "log-rolling," moved that the resolution be amended to state that "[n]o proposed law shall contain more than one subject." 2 Debates 856. This proposal was not accepted in that form, but Mr. Quincy of Boston suggested as acceptable the words "shall not contain unrelated subjects," and the suggestion was adopted. *Id.* at 856-857. As finally presented and adopted, the concept was included as one of the requirements on which the Attorney General should pass in certifying the measure. *Id.* at 953, 960.

The rescript opinion in *Scalley* v. *Registrars of Voters of Woburn*, 358 Mass. 815 (1971), provides no support for the plaintiffs' position. There, a single referendum petition challenging eight pay increase ordinances separately passed by the Woburn city council was held to be a nullity because of the inadequacy of the description of the proposed measure. The lower court judge also ruled that the petition pertained to more than one measure or part of a measure. *Id.* at 816. Neither he nor this court said that the eight pay increase ordinances were unrelated.

be said to be germane, the relatedness test is met. It is not for the courts to say that logically and consistently other matters might have been included or that particular subjects might have been dealt with differently. Unlike the situation in other States, the single subject concept has not been a part of the legislative process in this Commonwealth,[10] and we see no justification for importing that concept into the less restrictive limitation of "related subjects."

All portions of Proposition 2½ are related directly or indirectly to the limitation of taxes. Certain provisions provide directly for a limitation, or the possibility of a limitation, on taxes. See the limitations on local tax assessments (St. 1980, c. 580, § 1); the limitation on assessments for the motor vehicle excise (St. 1980, c. 580, § 9); and the State income tax deduction of one-half of rent paid for one's residence (St. 1980, c. 580, § 11). Cf. the different but allied limitation on the permissible level of municipal charges for goods or services (St. 1980, c. 580, § 12). The renter's deduction relates to a limitation of State taxation, even

---

[10] In upholding Proposition 13 against a variety of challenges, the Supreme Court of California considered and rejected a claim that the constitutional amendments made by Proposition 13 violated the constitutional requirement that no initiative measure may embrace more than one subject. *Amador Valley Joint Union High School Dist.* v. *State Bd. of Educ.*, 22 Cal. 3d 208, 229-232 (1978). Although the single subject limitation of the California Constitution seems to be more restrictive than our "related subjects" limitation, the California court noted that "an initiative measure will not violate the single-subject requirement if, despite its varied collateral effects, all of its parts are 'reasonably germane' to each other." *Id.* at 230. See *Fair Political Practices Comm'n* v. *Superior Court,* 25 Cal. 3d 33, 39 (1979), cert. denied, 444 U.S. 1049 (1980). Two of the four major elements of Proposition 13 related to property taxation and the other two elements related to additional or increased State or local levies of other than property taxes. The court noted that the extensive publicity concerning Proposition 13 minimized the risk of voter confusion and deception, one of the reasons for the single subject limitation. *Amador Valley Joint Union High School Dist.* v. *State Bd. of Educ., supra* at 231. Choosing to "avoid an overly strict judicial application of the single-subject requirement," the court held that Proposition 13 did not violate the single subject requirement of the State Constitution. *Id.* at 232. See *Coalition for Political Honesty* v. *State Bd. of Elections,* 83 Ill. 2d 236, 258-260 (1980), and cases cited.

though it is possible that the lost revenue might be made up by some other change in the income tax law. Other provisions indirectly affect the amount of taxes to be collected, by giving authority to municipalities to control expenditures or by restraining the Commonwealth and certain political subdivisions from imposing costs on cities and towns. See the requirement that the Commonwealth assume the cost, at least, of any new law or regulation imposing any direct service or cost obligation on any city or town without its consent (St. 1980, c. 580, § 2) (along with procedures for the enforcement of the requirement, St. 1980, c. 580, §§ 3 and 4); the authorization granted to a municipality to revoke its acceptance of certain provisions of the General Laws (St. 1980, c. 580, § 5); the elimination of the fiscal autonomy of school committees and regional district school committees (St. 1980, c. 580, §§ 6, 7, and 8); the elimination of binding arbitration for police and firefighters (St. 1980, c. 580, § 10); and the limitation on county and other assessments on cities and towns (St. 1980, c. 580, § 12).

It is, of course, possible to conceive of a general purpose to which not every subject of Proposition 2½ may be said to relate. If one characterizes Proposition 2½ as concerned only with local tax rates and the cost of local government, then the renter's deduction, involving a matter of State income taxes, would arguably be unrelated to the purpose attributed to Proposition 2½. Similarly, if one were to define Proposition 2½ as concerned only with the cost of residential housing in the Commonwealth, the reduction in the level of permissible motor vehicle excises would appear to be extraneous to that purpose. The plaintiffs' limited definitions of the purpose of Proposition 2½ tend to assure the desired conclusion of unrelatedness. The proper approach, however, is to assess what a proposed initiative does in its various aspects or subjects and to determine whether there is a common purpose to which each element is germane or, at least, to which it "cannot rightly be said to be unrelated." *Opinion of the Justices,* 309 Mass. 555, 561 (1941). All the subjects included in Proposition 2½ relate directly or indirectly to the limitation of State and local taxation.

### Excluded Matters

"No measure . . . the operation of which is restricted to a particular town, city or other political division or to particular districts or localities of the commonwealth . . . shall be proposed by an initiative petition." Art. 48, The Initiative, II, § 2. The MTA asserts that Proposition 2½ violates this prohibition because it does not apply uniformly throughout the Commonwealth. The MTA argues in particular that G. L. c. 59, § 21C (3), inserted by § 1 of the act and set forth in the margin,[11] has special provisions concerning any municipality whose total taxes assessed in fiscal year 1979 were less than 2½ % of the full and fair cash valuation of real and personal property in the municipality. Any such municipality must adhere to that lower percentage, or, if above it, return to it by proportionately lowering its revenue collections, subject to the right of the voters to increase the amount to be appropriated in a fiscal year by a two-thirds vote at a general election (see G. L. c. 59, § 21C [1] & [4], inserted by St. 1980, c. 580, § 1). There is no question that there are municipalities, mostly in rural areas of the Commonwealth, to which § 21C (3) will apply. The question, as the MTA presents it, is whether § 21C (3) contains an excluded matter because it "is restricted . . . to particular districts or localities of the commonwealth." If so, MTA argues, Proposition 2½ was improperly adopted through the initiative process.

---

[11] General Laws c. 59, § 21C (3), inserted by St. 1980, c. 580, § 1, provides as follows:

"Notwithstanding the provisions of sub-section (1), if in any city or town the total taxes assessed upon real estate and personal property as defined in this chapter in the fiscal year 1979 were less than two and one-half percent of the full and fair cash valuation thereof in such fiscal year, that lesser percentage shall be the maximum percentage of full and fair cash valuation at which such total taxes may be assessed under section one and if between the fiscal year 1979 and the effective date of the enactment of this section the total taxes so assessed shall have increased above the said lesser percentage, the total taxes so assessed shall be reduced annually by not less than fifteen percent of such total for each successive fiscal year until the total taxes so assessed shall not exceed the said lesser percentage."

Various opinions of the Justices of this court have indicated that particular proposed legislation could not be subject to a referendum under art. 48 because of language identical to the "particular districts or localities" exclusion of the initiative procedures of art. 48 (see art. 48, The Referendum, III, § 2). See *Opinion of the Justices*, 334 Mass. 721, 743-744 (1956) (bill concerning the creation of the Massachusetts Port Authority); *Opinion of the Justices*, 303 Mass. 615, 626 (1939) (bill not applicable to the counties of Dukes County and Nantucket and operating differently in Suffolk County); *Opinion of the Justices*, 261 Mass. 523, 554 (1927) (bill applicable only to municipalities served by the Boston Elevated Railway Company); *Opinion of the Justices*, 254 Mass. 617, 620 (1926) (bill establishing congressional, councillor, and senatorial districts and apportioning representatives).[12] See also *Opinion of the Justices*, 294 Mass. 607, 609 (1936) (initiative proposal limited to cities). Cf. *Opinion of the Justices*, 300 Mass. 602, 605 (1938) (bill to be effective only on acceptance by a municipality may be made the subject of an initiative petition even where it may effect a change in the law for only the city of Boston).

The meaning of art. 48's exclusion of any matter whose operation is restricted to "particular districts or localities" was discussed in *Christian* v. *Secretary of the Commonwealth*, 283 Mass. 98, 103-105 (1933), with particular reference to the Debates in the Massachusetts Constitutional Convention of 1917-1918 (1918). See 2 Debates in the Massachusetts Constitutional Convention 1917-1918, 693 (1918). The language concerning excluded matters was amended in the course of the deliberations to include the reference "to a particular district or locality." The amendment was explained at the convention as excluding "[l]aws that relate to a particular district or locality as opposed to the Commonwealth as a whole . . . . It was not intended to change the meaning of that exclusion at all, but

---

[12] In *Cohen* v. *Attorney Gen.*, 354 Mass. 384, 388-389 (1968), the court held that a petition that provided a uniform system of apportionment of representative districts but did not make an actual apportionment was not excluded from the initiative process.

to make it clear that it was simply a little wider than a single city or town. It might apply to a group of cities or towns." *Id.* Guided by this language, the court held in the *Christian* case that an attempted initiative petition proposing legislation concerning a district consisting of Boston and certain nearby cities and towns was excluded from the operation of art. 48's initiative provisions. There is no suggestion in the opinion that an act potentially applicable in various municipalities scattered throughout the Commonwealth would be excluded by the initiative process.

In *Mount Washington* v. *Cook,* 288 Mass. 67, 74 (1934), the court held that a statute of Statewide applicability but subject to suspension at the option of any city or town was not an excluded matter and thus could be subject to a referendum pursuant to art. 48. The court said that "the restriction to a particular town, city or other political subdivision or to particular districts or localities must be specified in the law itself in terms which expressly or by fair implication are geographically descriptive of territorial divisions of the Commonwealth, in order that the law be an excluded matter." *Id.*

The particular districts or localities exclusion of the initiative provisions of art. 48 does not require that a proposed statute have uniform, Statewide application. In its origin, it was intended simply to exclude from the initiative process legislation having only a regional impact. See *Christian* v. *Secretary of the Commonwealth, supra* at 103-105. Consideration must be given to the effect of a particular statute to ascertain whether it affects only one political subdivision or only particular districts or localities and thus addresses a parochial concern. In the words of *Mount Washington* v. *Cook, supra,* the "fair implication" of the terms of the statute must be assessed to see whether the statute is "geographically descriptive of territorial divisions of the Commonwealth."

Plainly, § 1 of Proposition 2½ has different consequences in various municipalities, depending on the percentage that a municipality's total tax assessments are (or have been) of

the full and fair cash value of its property. This is true both of municipalities that exceed 2½ % of full and fair cash valuation and of those below 2½ % of full and fair cash valuation. In imposing limitations on total assessments in all municipalities, and not just in those which exceed 2½ %, the act applies in all geographical areas of the Commonwealth and, in this respect, reduces, rather than increases, the particularity of its application. The law is not directed to specific cities and towns. It deals with property tax reductions or limitations throughout the Commonwealth, although in different degrees and in different ways, and in all instances is subject to local control (see G. L. c. 59, § 21C [1], [4], and [5]). It addresses a matter of Statewide concern. Where a law has no local or regional focus and where it makes no specific provision for the inclusion or exclusion of any city or town or of any particular district or locality, either on its face or in its application, the fact that the law may have different effects in various municipalities in a geographically random way does not exclude the measure from the initiative process. Such a law is not "restricted . . . to particular districts or localities."

The MTA advances a further argument that Proposition 2½ involves a measure constitutionally excluded from the initiative process. Article 48, The Initiative, II, § 2, excludes from an initiative petition (1) any measure that relates "to the powers, creation or abolition of courts" and (2) any proposition that is inconsistent with "the right of access to and protection in courts of justice" as "at present declared in the declaration of rights."[13] The argument is that by elimination of the fiscal autonomy of school committees and particularly by elimination of the means of judicially enforcing that autonomy (see St. 1980, c. 580, § 7, amending G. L. c. 71, § 34), the powers of the courts are improperly

[13] The latter restriction seems applicable only to an initiative petition seeking a constitutional amendment because no statute adopted by an initiative petition (or otherwise) could effectively modify or be inconsistent with constitutional rights.

implicated in changes wrought by Proposition 2½.[14] This argument overstates the prohibition against dealing with the powers of courts through the initiative process. If, as is the case, the fiscal autonomy of school committees may be abolished by an initiative measure, judicial enforcement of fiscal autonomy may also be abolished. The abolition of the judicial remedy has only an incidental effect on the powers of courts.

Our cases concerning this exclusion focus on the main design of the legislation and do not include a law within the prohibition "because, in an incidental and subsidiary way, the work of the courts may be increased or diminished or changed." *Horton* v. *Attorney Gen.*, 269 Mass. 503, 511 (1929). See *Opinion of the Justices*, 375 Mass. 795, 814-815 (1978); *Commonwealth* v. *Yee*, 361 Mass. 533, 537 (1972); *Cohen* v. *Attorney Gen.*, 354 Mass. 384, 387 (1968). The changes made in G. L. c. 71, § 34, are incidental and subsidiary in their effect on the courts. Adoption of a contrary view would suggest that the initiative process could not make any change in any law that was enforceable in the courts, that is, virtually any change in the law at all.[15]

### The Adequacy of the Summary

As adopted by the people in 1918, art. 48, The Initiative, II, § 3, required the Secretary of the Commonwealth to provide blanks for the use of subsequent signers of an initiative petition at the top of which should appear "a description of the proposed measure as such description will appear on the ballot." The description to appear on the ballot was

---

[14] This argument appears to be a late arrival at the Proposition 2½ battlefront. It was not raised below from all that appears, nor did the judge discuss the subject.

[15] We see no basis for the claim of one plaintiff group that matters concerning the imposition of an income tax are not permissible subjects of an initiative petition. We would expect to look only to the provisions of art. 48 concerning the initiative petition for matters excluded from initiation by such a petition. This is particularly so as to income tax legislation because the income tax amendment (art. 44) preceded the adoption of art. 48 concerning the initiative petition by only three years.

"to be determined by the attorney general." Art. 48, General Provisions, III. Article 48's requirement of a description presented problems with the length and complication of descriptions, problems that could not be solved by legislation. See *Sears* v. *Treasurer & Receiver Gen.*, 327 Mass. 310, 324 (1951); *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, 242 (1946); *Opinion of the Justices*, 309 Mass. 631, 643 (1941). As a result, amendments to art. 48 were proposed eliminating references to a "description" and substituting references to "a fair, concise summary, as determined by the attorney general." See *Barnes* v. *Secretary of the Commonwealth*, 348 Mass. 671, 673 (1965); *Bowe* v. *Secretary of the Commonwealth, supra* at 242-243. In 1944, the people ratified and adopted the proposed changes as art. 74 of the Amendments. Art. 48, The Initiative, II, § 3, as amended by art. 74, § 1, of the Amendments, and General Provisions III, Form of Ballot, as amended by art. 74, § 4. This 1944 amendment was intended to relax the requirements implicit in the word "description." See *Opinions of the Justices*, 357 Mass. 787, 799 (1970). Economy of language and fairness are now emphasized. "[C]onciseness and completeness are often incompatible." *Bowe, supra* at 243. Certainly incidental and relatively unimportant matters need not be included in the summary.

The action of the Attorney General in approving the summary of the initiative proposal is not beyond judicial review. *Horton* v. *Attorney Gen.*, 269 Mass. 503, 507-508 (1929). See *Evans* v. *Secretary of the Commonwealth*, 306 Mass. 296, 298 (1940). As a guide to whether the summary prepared by the Attorney General meets the requirement of conciseness and fairness, we look to opinions issued since its amendment by art. 74. In *Sears* v. *Treasurer & Receiver Gen.*, 327 Mass. 310, 324-325 (1951), which held invalid a one sentence summary of an eight page measure, the court discussed the requirements of a summary, saying: "The word carries with it the idea that, however much the subject matters may be condensed, the sum and substance of it must remain. No doubt details may be omitted or in many

instances covered by broad generalizations, but mention must be made of at least the main features of the measure." *Id.* at 324.

In *Opinions of the Justices*, 357 Mass. 787, 799-800 (1970), a majority of the Justices said the fact "[t]hat certain details have been omitted from the summary does not in our view invalidate it. Any other conclusion as to this summary would facilitate a return to the overelaborate description which tended to confuse rather than clarify." The principal purpose of the initiative petition that was before the Legislature and the subject of the 1970 advisory opinion was a proposed constitutional amendment reducing the size of the House of Representatives from 240 to 160 members. *Id.* at 788-789. There were matters of substance not covered by the summary. The majority of the Justices regarded those omitted matters as minor "when compared with the main purpose of the proposed amendment. The summary, if cluttered with detailed explanation and discussion, could no longer rightly be called a summary; it might fail of careful reading as a whole, and voters might not consider it of paramount importance. We think the summary falls within the *Bowe* case (*supra*, 320 Mass. 230), and the *Barnes* case (*supra*, 348 Mass. 671), rather than within the *Sears* case (*supra*, 327 Mass. 310). This is a matter of degree." *Id.* at 800. The majority of the Justices also noted that the voters would receive "full information about the proposal."[16] *Id.* at 801.

The significance of the opinions expressed by a majority of the Justices with regard to the adequacy of the summary considered in the 1970 *Opinions of the Justices* is emphasized by the dissenting views of Justice Kirk, with whom

---

[16] Article 48, General Provisions, IV, of the Amendments (as amended by art. 74, § 4), requires the Secretary of the Commonwealth to transmit to every registered voter "the full text of every measure to be submitted to the people" and certain additional material, including "other information and arguments for and against the measure" as may be provided by law. As to the current statutory requirements concerning the distribution of material, see G. L. c. 54, § 53, which in part requires that each voter be sent arguments for and against each proposed measure.

Justice Spiegel agreed. 357 Mass. at 802, 806-807 (opinion by Justice Kirk); *id.* at 810-811 (opinion by Justice Spiegel). Justice Kirk noted that the proposal was to amend the Constitution and was not merely a statutory enactment. He pointed out that the summary failed to state, or even hint, that the constitutional residence requirements for the office of senator and for the office of representative would be changed and that arts. 21 and 22 of the Amendments would be annulled. In his opinion, these deficiencies were so great as to make the summary unfair. On the other hand, although these omitted matters might be of significance standing alone, the majority of the Justices concluded that, in the circumstances, the omissions were minor.

This court has not directly faced the question of the deference, if any, that should be given to the judgment of the Attorney General concerning the content of a summary. Generally, discussions of the adequacy of a summary do not explicitly give any weight to the Attorney General's judgment. In *Sears* v. *Treasurer & Receiver Gen.*, 327 Mass. 310, 320-321 (1951), the court noted that the safeguards of art. 48 could not be disregarded and that art. 48 provides, in a carefully prescribed manner, certain precisely defined safeguards to assure that the voters are acquainted with proposed laws. The provisions and conditions of art. 48 must be strictly complied with and "[f]ailure to comply will mean that no valid law has been enacted." *Id.* at 321. Justice Kirk said that "[n]o presumption is to be indulged in favor of a summary notwithstanding that it was, in the first instance, prepared by the Attorney General." *Opinions of the Justices*, 357 Mass. at 805. No attention has been paid in recent decades to the contrary statement in *Anderson* v. *Secretary of the Commonwealth*, 255 Mass. 366, 369 (1926), that "whether the preliminary requirements have been complied with is for [the Attorney General] to determine and his decision, in the absence of bad faith, is final." This statement is particularly forceful because the issue in the *Anderson* case was not one of the content of a summary prepared under art. 48 but a question of law — whether the

subject of an initiative was excluded from adoption through the initiative process. However, the idea of almost total deference to the judgment of the Attorney General announced in the *Anderson* case was repudiated in *Horton* v. *Attorney General*, 269 Mass. 503, 508 (1929).

The Constitution places responsibilities on the Attorney General with respect to certain matters involved in the initiative process. One of these responsibilities is the preparation of a summary. Obviously, an element of discretion is involved in the preparation of a summary — what to include, what to exclude, and what language to use. The exercise of discretion by the Attorney General, a constitutional officer with an assigned constitutional duty, should be given weight in any judicial analysis of the fairness and adequacy of a summary.[17] His reasonable judgments as to what are minor matters should be respected. Where the question is "a matter of degree" (*Opinions of the Justices*, 357 Mass. 787, 800 [1970]), we would not substitute our judgment for his reasonable conclusions concerning the form and content of a summary.[18] In the practical operation of the initiative process, it is desirable that determinations be made before the people vote rather than after. Indeed, if possible, any contest over the adequacy of a summary should precede rather than follow the final determination of its form. Of course, the time available to make such a challenge is often short, and timely decisions cannot always be made so as to permit corrections. Once the initi-

---

[17] Courts in other jurisdictions have given presumptive validity to determinations made by public officials charged with the responsibility of preparing descriptive ballot material. See *Fletcher* v. *Bryant*, 243 Ark. 864, 867-869 (1968); *Amador Valley Joint Union High School Dist.* v. *State Bd. of Equalization*, 22 Cal. 3d 208, 243 (1978); *Epperson* v. *Jordan*, 12 Cal. 2d 61, 66 (1938) (per curiam); *Say* v. *Baker*, 137 Colo. 155, 159-160 (1958).

[18] This is the same deference to the judgment of the Attorney General that we shall extend to his opinion concerning the propriety of the perfecting amendment. See n.24 below and related text. The situation is different, however, where simply a question of law is involved, such as whether a matter is excluded from the initiative process or whether the subjects of the proposal are related within the requirements of art. 48.

ative process has run its course, however, defects not going to the fundamental procedural and substantive requirements of art. 48 cannot properly invalidate the action of the people.[19]

We now consider, in light of these principles, the plaintiffs' various objections to the summary prepared by the Attorney General. Some of the objections are to minor matters, and we first dispose of them briefly.

The summary stated that "[t]he proposal would limit the amount of money required to be appropriated for public schools to that amount voted upon by the local appropriating authority." This is a concise and fair summary of the consequences of Proposition 2½ in relation to the fiscal autonomy of local and regional school committees. The proposed change concerning the obligations of municipalities to finance public education was a dramatic one, reversing a long-standing rule of law in this Commonwealth. To be sure, the summary was brief in this respect. But it was fair and correct. It represents exactly the precision which art. 48's mandate of conciseness calls for. It follows logically, without saying, that the right of citizens to seek the aid of courts to enforce school committees' funding requests would be abolished when the obligation of local appropriating authorities to meet those requests was abolished.

The summary makes no mention of the right of a municipality to revoke acceptance of certain General Laws pre-

---

[19] The judge below noted that there is no dispute "that the present plaintiffs were well aware before the election of virtually all of the alleged inadequacies in the substance of the measure and the summary provided by the Attorney General." He thought that the plaintiffs had "had ample opportunity to seek pre-election relief." Whether these statements are correct as to all parties and as to virtually all issues, we need not determine. The doctrine of laches has no significant role in prompt, postelection challenges to the process by which an initiative measure was adopted. *Sears* v. *Treasurer & Receiver Gen.*, 327 Mass. 310, 326-327 (1951). However, this court has not hesitated to consider pre-election challenges to initiative proposals based on claimed failures to comply with art. 48. See, e.g., *Opinion of the Justices*, 375 Mass. 795, 802 n.1 (1978), and cases cited; *Brooks* v. *Secretary of the Commonwealth*, 257 Mass. 91, 96-97 (1926).

viously accepted by the municipality. Proposition 2½ proposed an amendment to G. L. c. 4 by adding a new section 4B generally to this effect. St. 1980, c. 580, § 5. The Legislature had already passed a similar, but not entirely identical, provision. See St. 1979, c. 518, § 1, inserting a new G. L. c. 4, § 4B, effective July 1, 1981 (see St. 1979, c. 518, § 2). Although the existence of two forms of § 4B of G. L. c. 4 may present problems in specific instances arising in the future and although the duplication demonstrates a lack of attention to detail in the preparation of the initiative proposal, certainly the omission from the summary of mention of the consequences of the adoption of § 5 of Proposition 2½ was the omission of a minor, indeed a trivial, subject.

An omitted matter of somewhat greater importance was the summary's failure to mention that § 21C (5) of G. L. c. 59, as proposed to be inserted by St. 1980, c. 580, § 1, would authorize a municipality, by vote of a majority of those voting, to reduce the statutory limit on the assessment of local property taxes to a rate below 2½ % (or below such other percentage as would be in effect pursuant to § 21C). Tax assessments in excess of that percentage could be achieved only by a two-thirds vote (G. L. c. 59, §§ 21C [1] and [4], inserted by St. 1980, c. 580, § 1), and the summary so stated ("a city or town could raise its limit by a ⅔ local vote at a general election"). The power to reduce the amount of local property tax assessments already resided in the local appropriating authority of each municipality, quite apart from anything set forth in Proposition 2½. The proposal that the voters themselves could impose such a limit by vote at a general election obviously would be a substantive change in the law. But it was not a major change in relation to the provisions of Proposition 2½ considered as a whole. The Attorney General's judgment to omit any such reference from the summary was reasonable.[20]

---

[20] In light of the conclusion we express subsequently (see n.25) that Proposition 2½ abolished binding arbitration in labor negotiations concerning police and firefighters, the statement to that effect in the summary was accurate and, therefore, fair.

The failure of the summary to mention that Proposition 2½ contained a severability clause, which is set forth in the margin,[21] could have presented a serious question for this court. The concept that subjects which have to be "related" (see art. 48, The Initiative, II, § 3) may nevertheless be severable is a challenging one. The summary's failure to mention that, if any part or parts of Proposition 2½ were to be held unconstitutional, the other parts would survive would be a matter worthy of our serious attention if it were not for the fact that, in this opinion, we reject all challenges to the constitutionality of Proposition 2½. We decline to speculate on the possibility of the unconstitutionality of Proposition 2½ on any ground not raised in this appeal and will not analyze the propriety of the summary's omission of a reference to the severability clause on the mere possibility that some other constitutional challenge to Proposition 2½ might prevail.

We come then to a clear error in the summary. The summary stated that "[i]f a locality *currently* imposes a tax of less than 2½ %, it would not be allowed to increase the tax rate" (emphasis supplied). The fact is that proposed G. L. c. 59, § 21C (3), set forth in n.11 above, provides that, if the rate of a city or town was below 2½ % in the fiscal year 1979, that lesser (1979) percentage would be the maximum percentage of full and fair cash valuation at which taxes could be assessed and, if between fiscal year 1979 and the effective date of § 21C, the total taxes so assessed had been increased above the 1979 percentage, the total taxes assessed would have to be reduced annually (by not less than 15% each year) until the total taxes assessed reached the lesser percentage. In analyzing the practical effect of the summary's reference to the current (fiscal year 1981) percentage, the trial judge appropriately noted: "It is clear, therefore, that

---

[21] Statute 1980, c. 580, § 13, reads as follows:

"The provisions of this act are severable, and if any of its provisions or an application thereof shall be held unconstitutional by any court of competent jurisdiction, the decision of such court shall not affect or impair any of the remaining provisions or other applications thereof."

the summary erroneously stated to voters that they ought consider their then current tax rate in relation to the proposed . . . tax ceiling and not the tax rate for the fiscal year 1979 to which the proposed act actually applied in cases where that rate was less than two and one-half percent."

If Proposition 2½ had simply proposed to all municipalities in the Commonwealth that they be restricted to the level of taxes assessed in the 1979 fiscal year and the summary had mistakenly described the ceiling as the level of taxes assessed in the 1981 fiscal year, we would not hesitate to rule that the inaccuracy in the summary made it unfair in violation of art. 48's command that the summary be fair and concise. The plaintiffs argue that the error in the summary of Proposition 2½ is fatal and that the court should not look beyond that error to assess its likely impact on the judgment of the voters or on the result of the vote.

We think that the error must be assessed in the context of the entire proposal and its likely impact on the voters. A determination cannot be made in a vacuum whether an error in a summary is minor or fatal to the validity of all or part of a proposal. It was well known that Proposition 2½ would require reductions in local tax assessments for many communities. The argument against Proposition 2½ printed in the information distributed to all registered voters by the Secretary of State before the 1980 election said "86% of the state's population lives in communities that would suffer drastic cuts the first year of Proposition 2½."

Of course, the error involved the amount of taxes to be assessed only in those municipalities that were below 2½% in fiscal year 1979. There were, according to the judge's unchallenged findings, sixty-five communities below 2½% in fiscal year 1979.[22] Of these sixty-five municipalities, all

[22] There were apparently approximately twenty-five other towns which were below 2½% in the 1979 fiscal year, but it seems that they had not established their 1981 fiscal year tax levies at the time of the 1980 general election. Voters in these towns had no current levy to consider in assessing how to vote. As to them the summary was both erroneous and uninstructive, but not as forcefully misleading as in municipalities that had

towns with relatively small populations, thirty-nine had fiscal year 1981 levies below their 1979 fiscal year levies. As to those voters in these thirty-nine towns who may have been misled by the error in the summary, it seems reasonably clear that, if they were in favor of restricting assessments to the lower 1981 fiscal year assessments, they would certainly have voted for a restriction at the higher 1979 fiscal year assessment. It is most doubtful that any such voter would have changed his position and voted against Proposition 2½ because in fact it did not cut as deeply as the 1981 fiscal year level assessments in his town.

The fact remains, of course, that, as to twenty-six towns, voters who relied on the summary would not have learned that their town's assessments would be rolled back to 1979 fiscal year levels. There are 351 cities and towns in the Commonwealth. Even if all the votes in favor of Proposition 2½ cast in the twenty-six towns had been cast instead in the negative, the result of the vote on Proposition 2½ would not have been changed.[23] We reject any suggestion that a constitutional error in the initiative process may be rendered insignificant by the size of the popular vote. See *Sears* v. *Treasurer & Receiver Gen.*, 327 Mass. 310, 321 (1951). Constitutional limitations and requirements are designed to impose restraints on the exercise of the momentary will of the majority on certain matters. Thus, we think that the sole test of the constitutionality of the error cannot be to reassign all votes and potential votes that were subject to a possibly misleading influence, and then to recalculate the result. However, the magnitude of the error in the sum-

already fixed their fiscal 1981 tax rates. One additional town, Falmouth, had apparently no difference of significance between its 1979 and 1981 fiscal year tax levies.

[23] The judge concluded, dealing with all sixty-five communities, that "the outcome of the popular vote on the Act would not have been affected even if every voter who voted in the affirmative or who left his vote blank on Question 2 in each of these 65 communities had voted in the negative (and, indeed, if every registered voter who neglected to come to the polls in each of those 65 communities had appeared to vote in the negative)."

mary may properly be measured by an analysis of the extent
to which it was likely to have influenced voters. Here, the
error was one of limited, not Statewide, influence. The
concept of a reduction and rollback of local tax assessments
was a well known aspect of Proposition 2½. The summary
did not ignore that concept as applied to municipalities
below 2½ %. In any event, the summary was not the only
source of voter information on this widely debated proposal.
In the entire scheme of Proposition 2½ and the Attorney
General's summary, the error, although unfortunate, was
minor and not significantly misleading. The summary was
fair within the meaning of art. 48 regardless of the inaccuracy.

### The "Perfecting" Amendment

Although the proponents of Proposition 2½ intended to
eliminate final and binding arbitration for policemen and
firefighters, the proposal as originally submitted mistakenly
failed to do so. That initial proposal provided for the repeal
of "Section 4A of Chapter 1078 of the Acts of 1973, as most
recently amended by Chapter 154 of the Acts of 1979." The
reference should have been to Section 4 and not to Section
4A. Section 4A established a Joint Labor-Management Com-
mittee with responsibility for collective bargaining negotia-
tions involving municipal police officers and firefighters.
That committee may order disputes to be submitted to bind-
ing arbitration "in accordance with the standards, provisions
and limitations" of § 4 of St. 1973, c. 1078. See St. 1979,
c. 154, § 1, second subparagraph (4). It is § 4 that sets the
conditions for binding arbitration in the resolution of dis-
putes between a municipality and the collective bargaining
units of its policemen and firefighters.

The summary of Proposition 2½ under which the neces-
sary number of signatures was obtained stated that the pro-
posal would "repeal the law which provides for compulsory
binding arbitration when labor negotiations concerning
police and fire personnel come to an impasse." After the
signatures initially required to advance an initiative claim
were obtained and after the General Court rejected the en-

tire proposal, the proponents sought to make a "perfecting change" in § 10 of Proposition 2½ by deleting the reference to § 4A and substituting a reference to § 4 of St. 1973, c. 1078, as amended.

When an amendment is proposed by its sponsors, the Attorney General is authorized by art. 48, The Initiative, V, § 2, to certify "that the amendment made by such proposers is in his opinion perfecting in its nature and does not materially change the substance of the measure." The Attorney General certified the change as a perfecting amendment. We reject the International Brotherhood of Police Officers' argument that the change was not a constitutionally permissible perfecting amendment.

No one was misled significantly by the error in the draftsmanship. The summary correctly stated the purpose of the proposal, although the summary and the text were inconsistent until the perfecting change was made. Signatures were obtained pursuant to the summary. The change permitted the people to vote on the proposal in the form in which it was intended.

It is true, however, that the change was more than a technical adjustment. In *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, 233 (1946), we upheld as a proper perfecting amendment a change in a technically deficient statutory reference. The *Bowe* case did not involve, however, a substitution of one section of a statute for another section of that statute. The debates at the 1917-1918 Constitutional Convention indicate that it was intended that petitioners could amend their proposal to do more than make changes in "form and phraseology" (2 Debates at 773), provided any change was not a material change of the substance of the petition. *Id.* at 776-778. The intent of all signatories of the petition is clear from the summary. Indeed, the Attorney General's summary was the only information about the proposal contained on the forms used to gather signatures. See art. 48, The Initiative, II, § 3.

Article 48 assigns to the Attorney General the task of expressing his opinion whether a proposed amendment meets

the requirements expressed in art. 48, The Initiative, V, § 2. In such a matter, we should accept any reasonable judgment expressed by the Attorney General.[24] II Debates at 773. We regard as reasonable his conclusion that the change in § 10 of Proposition 2½ was a perfecting amendment permitted by art. 48.[25]

### *The Constitutionality of the Renter's Deduction*

The plaintiffs challenge the constitutionality of the renter's deduction, a deduction from taxable income of fifty per cent of the rent paid by an individual who rents his principal place of residence in the Commonwealth. See St. 1980, c. 580, § 11.[26] The argument is founded on two somewhat

---

[24] In this respect, our deference to the opinion of the Attorney General is the same as that we extended in our consideration of the adequacy of his summary of the initiative petition. See n.18 above and related text.

[25] The question whether, after the adoption of Proposition 2½, the Joint Labor-Management Committee could order binding arbitration under § 4A arises only indirectly in the consideration of the propriety of the "perfecting" amendment. It is appropriate, however, in passing on the validity of the perfecting amendment, to make the assumption that, upon the enactment of Proposition 2½, binding arbitration could not be ordered under § 4A.

Because the question of the existence of any continuing authority to order binding arbitration in proceedings under § 4A had a bearing on our earlier consideration of challenges to the adequacy of the summary (see n.20 above), we note at this point that we construe the repeal of § 4 by § 10 of Proposition 2½ as eliminating binding arbitration pursuant to § 4A. Section 4A directs that "arbitration proceedings in matters over which the committee assumes jurisdiction, shall be conducted in accord- ance with the standards, provisions and limitations of said section four." With the repeal of § 4, binding arbitration under § 4A also was repealed. The summary's expression of the intention to eliminate binding arbitra- tion is particularly instructive in construing the intention behind the enactment of § 10. Moreover, as the judge noted, the Joint Labor- Management Committee had become "the dominant force in resolving police and firefighter labor deadlocks by means of binding arbitration." If binding arbitration were to be permitted under § 4A after the repeal of § 4, the purpose behind the enactment of § 10, that is, the elimination of binding arbitration for policemen and firefighters, would be thwarted.

[26] Section 11 reads as follows:

"Section 3 of Chapter 72 of the General Laws, as most recently amend- ed by Chapter 599 of the Acts of 1977, is hereby further amended by add- ing after Part B (8) the following new sub-paragraph:

related theories: (1) the classification violates equal protection of the laws provisions of the Fourteenth Amendment to the Constitution of the United States and comparable principles expressed in the Constitution of the Commonwealth, and (2) the special classification of rent payers violates the uniformity and proportionality requirements of other provisions of the State Constitution, most particularly the requirements of uniformity set forth in art. 44 of the Amendments.[27] Our analysis of these constitutional challenges is governed by the same principles that would govern our analysis if the measure had been adopted by the Legislature rather than through the initiative process. See *Commonwealth* v. *Higgins*, 277 Mass. 191, 193 (1931).

The plaintiffs' challenges based on a claimed violation of equal protection of the law principles are of no merit. The applicable standards in equal protection analysis under the Fourteenth Amendment to the Constitution of the United States and comparable provisions of the Constitution of the Commonwealth are well established. The essential point is

---

"(9) In the case of an individual who rents his principal place of residence in the Commonwealth, an amount equal to fifty percent of such rent."

The reference to c. 72 of the General Laws is wrong. The reference should be to G. L. c. 62. Also, the reference to § 3 B (8) of G. L. c. 62 should be to § 3 B (*a*) (8) of G. L. c. 62.

[27] Article 44, which was approved by the people in 1915, authorizes the Legislature to impose and levy a tax on income. Such a tax must "be levied at a uniform rate throughout the commonwealth upon incomes derived from the same class of property. The general court . . . may grant reasonable exemptions and abatements." We regard as included within the words "exemptions and abatements" all kinds of tax provisions favorable to a taxpayer, including deductions from income and credits against tax obligations.

In addition to art. 44, the plaintiffs rely on the requirement of Part II, c. 1, § 1, art. 4, of the Constitution of the Commonwealth that taxes be "proportional and reasonable," and the provisions in art. 10 of the Declaration of Rights that "each individual . . . in the enjoyment of his life, liberty and property . . . is obliged . . . to contribute his share to the expense of this protection." It has been said that the proportionality requirement of Part II, c. 1, § 1, art. 4, presents a more precise statement of the general principle of art. 10. See *Opinion of the Justices*, 324 Mass. 724, 727 (1949).

that "[a] classification by a Legislature of property and persons for the purpose of taxation is not violative of . . . [the equal protection] clause of the Fourteenth Amendment so long as any basis of fact can be reasonably conceived showing that the distinction upon which it rests has a fair and rational relation to the object sought to be accomplished by the enactment, and so long as, the classification being valid, the State deals equally with all the members of the same class." *Frost* v. *Commissioner of Corps. & Taxation*, 363 Mass. 235, 248, appeal dismissed, 414 U.S. 803 (1973), quoting from *Old Colony R.R.* v. *Assessors of Boston*, 309 Mass. 439, 446 (1941). A State's scope of discretion is especially wide in the field of taxation. *Smith* v. *Commissioner of Revenue*, 383 Mass. 139, 141 (1981). *Keniston* v. *Assessors of Boston*, 380 Mass. 888, 892-893 (1980). *Mary C. Wheeler School, Inc.* v. *Assessors of Seekonk*, 368 Mass. 344, 346-347 (1975). The line of cases in the Federal courts upholding this principle is lengthy. See, e.g., *Kahn* v. *Shevin*, 416 U.S. 351, 355-356 (1974), and cases cited in n.9. The same is true of this court's cases. In addition to those cases already cited, see *Beals* v. *Commissioner of Corps & Taxation*, 370 Mass. 781, 785 (1976); *Weinstock* v. *Hull*, 367 Mass. 66, 70, appeal dismissed, 423 U.S. 805 (1975); *Roberts* v. *State Tax Comm'n*, 360 Mass. 724, 728-729 (1972).

The distinction between residential renters and nonrenters is a rational one in equal protection terms. The people could easily have concluded that residential tenants should be given favored income tax treatment as a means of offsetting Federal tax advantages accorded home owners as well as State tax benefits that home owners could be expected to realize as a result of other provisions of Proposition 2½. In determining the rationality of an enactment for equal protection purposes, it is entirely appropriate to consider the effects in Massachusetts of Federal taxing measures. See, e.g., *Frost* v. *Commissioner of Corps & Taxation*, 363 Mass. 235, 251-253, appeal dismissed, 414 U.S. 803 (1973).[28]

---

[28] In the discussion that we next undertake concerning the stricter standard of art. 44, we note that support for the reasonableness of the renter's

The plaintiffs' challenge to the renter's deduction as a violation of art. 44's requirement of uniformity is more substantial. We first discuss the relevant principles of law.

One effect of art. 44 was to withdraw from the scope of the proportionality requirement of Part II, c. 1, § 1, art. 4, whatever is rightly made subject to the income tax. *Opinion of the Justices,* 270 Mass. 593, 599 (1930). *Duffy* v. *Treasurer & Receiver Gen.,* 234 Mass. 42, 47 (1919), appeal dismissed sub nom. *Dane* v. *Burrill,* 255 U.S. 580 (1921). *Tax Comm'r* v. *Putnam,* 227 Mass. 522, 526 (1917). Thus, there is no requirement that levies on income and on property be proportional to each other. *Id.* at 526. P. Nichols, Taxation in Massachusetts 471 (3d ed. 1938). In view of the diverse treatment of local property taxation within the Commonwealth, it would be impossible to achieve over-all proportionality in the application of both local taxation of property and a Statewide income tax law. Article 44 does express, however, a rule of proportionality by requiring "a uniform rate throughout the Commonwealth upon incomes derived from the same class of property." See *Opinion of the Justices,* 354 Mass. 792, 794 (1968).

Turning to the issue before us, the plaintiffs argue that the uniformity required by art. 44 is destroyed by giving renters a deduction in determining their State income tax liability where home owners are given no reasonably parallel deduction, such as a deduction for local real estate taxes paid or for interest payments on mortgage obligations, or both. They point to opinions interpreting the proportionality requirement of Part II, c. 1, § 1, art. 4, to the effect that special treatment extended to a single class of taxpayer is impermissible.[29] The plaintiffs further indicate that the rent-

deduction may not as easily be found by reference to the operation of the Federal income tax law and the Commonwealth's system of local taxation of real estate.

[29] In the matter of the assessment of local real estate taxes, there are numerous statements concerning the impropriety of imposing taxes on one class of property at a different rate from that applied to other classes. See, e.g., *Opinion of the Justices,* 344 Mass. 766, 769 (1962) (exemption from

er's deduction does not fit into the pattern of exemptions that have previously been approved. See *Opinion of the Justices*, 324 Mass. 724, 731-733 (1949), where exemptions from local property taxes are classified and discussed.

The Attorney General argues that the renter's deduction is a reasonable exemption authorized by art. 44. The "reasonable exemptions" provision of art. 44 does not authorize special treatment that undercuts the dominant requirement of uniformity in art. 44. See *Opinion of the Justices*, 354 Mass. 792, 794 (1968) (a deduction for certain political contributions not reasonable exemption or abatement under art. 44). However, "[t]he power of exemption implies to some extent the power of discrimination and of classification required by the best interests of society." *Opinion of the Justices*, 270 Mass. 593, 601 (1930). The only limitation on exemptions stated in art. 44 is that they be reasonable, but by implication they must not conflict with other provisions of the Constitution. *Id.* at 599. Exemptions from the income tax have been approved as reasonable. *Id.* at 601 (exemption of minimum amounts of income from taxation). "The Legislature surely has a considerable range of discre-

---

local property tax of $5,000 of value of owner occupied residence disapproved. No benefit to, and a likely additional burden on, rent payers); *Bettigole* v. *Assessors of Springfield*, 343 Mass. 223, 230-231 (1961) (disproportionate assessments); *Opinion of the Justices*, 324 Mass. 724, 728-729 (1949), and cases cited (five-year exemption for newly constructed residences disapproved).

A strict rule of proportionality need not be satisfied where the Legislature has acted to allocate the burden of public expenses among cities and towns. See *Brookline* v. *County Comm'rs of Norfolk*, 367 Mass. 345, 350-351 (1975). Also, proportionality in the matter of local taxation of property has never been applied between or among municipalities. See *Associated Indus. of Mass., Inc.* v. *Commissioner of Revenue*, 378 Mass. 657, 663-666 (1979); *Opinion of the Justices*, 324 Mass. 724, 729 (1949), and cases cited. The 1978 classification amendment (Part II, c. 1, § 1, art. 4, as amended by art. 112 of the Amendments) allowing, for the purposes of local real estate taxation, limited classifications of property according to use and further allowing "reasonable exemptions" has provided an additional basis for departure from proportionality in the matter of local taxation of property. See *Associated Indus. of Mass., Inc.* v. *Commissioner of Revenue*, 378 Mass. 657 (1979).

tion within the bounds of reason . . . in establishing exemptions from the tax." *Daley* v. *State Tax Comm'n*, 376 Mass. 861, 865-866 (1978).

We reject as an adequate justification for the renter's deduction the fact that the Federal income tax law grants a residential property owner deductions for local property taxes assessed to and paid by him and for interest payments on his mortgage obligations. Further, we do not find the fact that Proposition 2½ is expected to reduce local property taxes for many home owners to be a reasonable basis for upholding the renter's deduction. While these circumstances, extraneous to the operation of the State income tax statutes, may be given some weight in the analysis of the reasonableness of the renter's deduction under art. 44, the requirement of uniformity and the reasonableness of any exemption must largely be tested and met within the scope of the income tax system itself.

Analyzing the reasonableness of the renter's deduction in relation to the operation of the Commonwealth's income tax provisions, we find reasonable justification for the deduction in the untaxed benefit, measured by the fair rental value, that a home owner receives in the use of his home. In order to reach our conclusion that the renter's deduction is reasonable, we need not decide that the fair rental value of a home owned by its occupant is income which could be subject to taxation under art. 44. It is sufficient to note that a home owner has invested assets in his home, that he derives an economic benefit from his occupancy of it, and that our income tax law does not impose any obligation on the home owner to make any tax payment on account of his receipt of that benefit.[30]

---

[30] Income as used in art. 44 is a broad concept. Shortly after the adoption of art. 44, this court construed art. 44 to express "a comprehensive idea" and said it should not "be given a narrow or constricted meaning." *Tax Comm'r* v. *Putnam*, 227 Mass. 522, 526 (1917). "It must be interpreted as including every item which by any reasonable understanding can fairly be regarded as income." *Id.* Recently, we noted that 1971 changes in the income tax statutes were made "to utilize the full measure

Although practical considerations no doubt justify the failure to tax the fair rental value of residential real estate to its owner-occupant, it is clear that the home owner receives a tax-free benefit from the use of the equity in his home. If the taxpayer had invested his assets instead in securities, savings, or other property, he would expect to generate taxable income (assuming no other exemption). A person with

of [the Legislature's] power to tax incomes by adopting a general income tax, typically described as one taxing income irrespective of its source, in conformity with the Federal model." *Ingraham* v. *State Tax Comm'n*, 368 Mass. 242, 247 (1975).

A taxpayer's use of his own residence may fairly be regarded as income, imputed income. See 1 B.I. Bittker, Federal Taxation of Income, Estates and Gifts par. 5.3.1, at 5-22 (1981); J.C. Chommie, Federal Income Taxation § 17, at 34-35 (2d ed. 1973); R. Goode, The Individual Income Tax 117-125 (Brookings Inst., rev. ed. 1976); H.C. Simons, Personal Income Taxation 112 (1938). Other countries have attempted or currently do attempt to tax this form of income. See Merz, Foreign Income Tax Treatment of the Imputed Rental Value of Owner-Occupied Housing: Synopsis and Commentary, 30 Nat'l Tax J. 435 (1977). The Wisconsin Income Tax Law of 1911, upheld in *Income Tax Cases*, 148 Wis. 456, 512-513 (1912), appeal dismissed sub nom. *Bolens* v. *Wisconsin*, 231 U.S. 616 (1914), included the estimated rental value of owner-occupied residential property in income.

The Supreme Court once stated its view, in dicta, that the rental value of a building used by its owner does not constitute income within the meaning of the Sixteenth Amendment. *Helvering* v. *Independent Life Ins. Co.*, 292 U.S. 371, 379 (1934). Although the Court has not considered the issue since, its conception of taxable income has, over time, grown more expansive than in the years following the enactment of the Sixteenth Amendment. See *James* v. *United States*, 366 U.S. 213, 218-220 (1961); *Commissioner* v. *LoBue*, 351 U.S. 243, 246 (1956); *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426, 429-431 (1955); *Helvering* v. *Bruun*, 309 U.S. 461, 468-469 (1940). Legal commentators see little reason today to believe that it would be unconstitutional for Congress to tax imputed income from home ownership. 1 B.I. Bittker, *supra*, par. 5.3.3. Lowndes, Current Conceptions of Taxable Income, 25 Ohio St. L.J. 151, 152-153 (1964). S.S. Surrey & W.C. Warren, Federal Income Taxation 129 (1960).

One should not assume that the scope of art. 44's grant of authority to tax income is any less broad than the authority of Congress to tax income under the Sixteenth Amendment. In *Tax Comm'r* v. *Putnam, supra*, a stock dividend was held to be income subject to tax under art. 44's authorization, whereas three years later, in *Eisner* v. *Macomber*, 252 U.S. 189 (1920), the Supreme Court of the United States held that a stock dividend could not be taxed as income within the meaning of the Sixteenth Amendment.

$50,000 invested in his home pays no annual State income tax with respect to the benefit realized from that investment, whereas a home renter who also has $50,000 but invests it in stock, for example, will be taxed on the annual income from that investment.

In the absence of the renter's deduction, a rent payer is taxed on his income from the investment of his assets without the benefit of any "exemption" similar to that extended to the home owner. The renter's deduction tends to reduce the disparate treatment of the home owner and home renter in the operation of the income tax law. It has been said that the failure to tax imputed rents is a cause of inequity between home owners and renters that "might be cured by a special deduction for renters." B.I. Bittker & L.M. Stone, Federal Income Taxation 83 (5th ed. 1980). See also Note, Federal Income Tax Discrimination Between Homeowners and Renters: A Proposed Solution, 12 Ind. L. Rev. 583, 600-601 (1979); R. Goode, The Individual Income Tax 124 (Brookings Inst., rev. ed. 1976). Considering home owners' obligations to pay local real estate taxes, to maintain their premises, to pay for insurance, and to pay interest on their mortgages, the allowance of a deduction of one-half of the rent paid annually by a residential tenant appears reasonable in relation to the benefit a home owner receives from the tax-free use of his home. The command of uniformity expressed in art. 44 is at least as fully met with the renter's deduction as it was before the adoption of the renter's deduction.

## Conclusion

We have considered all the challenges argued to us with respect to the rulings the judge reported for appellate review and find no error in those rulings. It is appropriate, therefore, that judgment be entered in the Superior Court declaring that Proposition 2½ (St. 1980, c. 580) was lawfully adopted through the initiative process of the Constitution of the Commonwealth and that the renter's deduction, provided for by G. L. c. 62, § 3 B (9), inserted by St. 1980,

c. 580, § 11, is, on its face, neither violative of the equal protection provisions of the Constitution of the United States or of the Constitution of the Commonwealth, nor violative of the proportionality and uniformity requirements of the Constitution of the Commonwealth.

*So ordered.*