LENK, J. (concurring).
I concur with the result and with much of the court's reasoning as to whether Initiative Petition 15-17 contains related subjects. I write separately because I agree with the dissent's view that the mandate in art. 48 of the Amendments to the Massachusetts Constitution requiring that a petition contain "only subjects ... which are related or which are mutually dependent" is disjunctive in nature; it sets out two alternatives and calls for two different analyses. I agree, further, with the dissent that the court should consider the phrase "mutually dependent" as it would have been understood at the time of the 1917-1918 Constitutional Convention, as discussed in the court's then extant jurisprudence concerning the severability of statutory provisions. Although this case presents squarely the question whether unrelated subjects may be mutually dependent-they can be, if rarely-I disagree with the dissent that Initiative Petition 15-17 contains subjects which are in fact mutually dependent.
In the years leading up to the Constitutional Convention, to decide whether statutory provisions were severable, this court would consider whether they were "mutually dependent and must stand or fall together."
*327 See Nolan's Case, 122 Mass. 330, 333 (1877). Where each provision of a statute could "stand independently,"
**803 the provisions were not considered mutually dependent and, accordingly, were deemed severable. See Commonwealth v. Petranich, 183 Mass. 217, 220, 66 N.E. 807 (1903). See also County of Berkshire v. Cande, 222 Mass. 87, 90-91, 109 N.E. 838 (1915) (statutory parts that are "wholly independent of each other" are severable).[1]
Although severability analysis concerns statutory provisions, art. 48, The Initiative, II, § 3, of the Amendments to the Massachusetts Constitution, as amended by art. 74 of the Amendments, speaks of "subjects ... which are mutually dependent." To determine whether Initiative Petition 15-17 satisfies this constitutional requirement, we must ask whether the subjects of Initiative Petition 15-17 can "stand independently" and, if not, whether they must instead "stand or fall together." See Petranich, 183 Mass. at 220, 66 N.E. 807 ; Nolan's Case, 122 Mass. at 333. That, in turn, requires us to ascertain what those subjects are. While the number of provisions in a statute turns on how the statute is written, discerning the subjects contained therein is a question of substance. Compare Century Dictionary and Cyclopedia 4806 (1904) (defining "provision" as "a distinct clause in an instrument or statute") with id. at 6020 (defining "subject" as "[t]hat on which any mental operation is performed; that which is thought, spoken, or treated of"). See 2 Debates in the Massachusetts Constitutional Convention 1917-1918, at 567-568 (1918) (chair of committee on rules and procedure using "matters" and "subjects" interchangeably).
If Initiative Petition 15-17 is viewed as containing two subjects-a tax on millionaires and how to spend it-as framed, the two are not severable and are mutually dependent. This is so because, although the tax could "stand independently," see Petranich, 183 Mass. at 220, 66 N.E. 807, the spending matter could not. The latter merely places conditions on the revenue raised by the tax; without the tax, it would be ineffectual.
There is no requirement, however, that our analysis be controlled by the structure of the petition imposed by its proponents. As discussed, art. 48, The Initiative, II, § 3, as amended by art. 74, **804 speaks of subjects, rather than provisions; a provision may be drafted to concern multiple subjects. In this regard, Initiative Petition 15-17 contains three subjects, insofar as the spending matter consists of two: education and transportation. These two subjects have no apparent interaction, and are "distinct and in their nature separable the one from the other." Ashley v. Three Justices of the Superior Court, 228 Mass. 63, 81, 116 N.E. 961 (1917). Nor can they be deemed "conditions, considerations or compensations for each other." Warren v. Mayor & Alderman of Charlestown, 2 Gray 84, 99, 68 Mass. 84 (1854). A tax on millionaires, dedicated to funding education, could "stand independently" as its own petition, with an internal mutual dependence. See Petranich, 183 Mass. at 220, 66 N.E. 807. The same is true of a tax on millionaires that funded transportation projects. In addition to a taxing provision without spending provisions, therefore, *328 Initiative Petition 15-17 could be severed into two stand-alone petitions, each containing two of its three subjects. Because Initiative Petition 15-17 could be severed in this way, its three subjects need not all "stand or fall together," Nolan's Case, 122 Mass. at 333, and there is no mutual dependence shared among them.
Given that the three subjects in Initiative Petition 15-17 are neither related nor mutually dependent, I am constrained to agree with the court that the petition may not be put before the people.
BUDD, J. (dissenting, with whom Gants, C.J., joins).
Disregarding the plain text of art. 48, The Initiative, II, § 3, of the Amendments to the Massachusetts Constitution, as amended by art. 74 of the Amendments, which requires that an initiative petition contain "only subjects ... which are related or which are mutually dependent," the court concludes that, in drafting this language the delegates to the Constitutional Convention of 1917-1918 inserted the words "or which are mutually dependent" as superfluous text. Ante at ----, ----. The court goes on to conclude that the people may not express their opinion on a one-section, four-sentence petition because it contains subjects that are not related. Ante at 325. That analysis is flawed.
The constitutional text is the written expression of the Constitutional Convention's intent to ensure that ballot questions containing multiple severable distinct, independent, and unrelated subjects cannot be asked of voters together in one ballot question, **805 but instead must be severed and asked of voters independently.[1] The court's analysis ignores the meaning of "mutually dependent" as it was understood at the time art. 48 was drafted and ratified. Despite the fact that Initiative Petition 15-17's subjects are mutually dependent and are not distinct, independent, and severable, the court incorrectly concludes that the petition cannot be asked of voters even though it falls under no "excluded matter" listed under art. 48, The Initiative, II, § 2, of the Amendments.[2] Prohibiting the people *329 from voting on this petition undermines the legislative power given to the people to draft and enact laws in a manner that is incompatible with the separation of powers principles set forth in art. 30 of the Massachusetts Declaration **806 of Rights.
For these reasons I dissent.
1. The meaning of "mutually dependent" in art. 48. We have recently held that a petition is not mutually dependent if its provisions can "exist independently." Gray v. Attorney Gen., 474 Mass. 638, 648, 52 N.E.3d 1065 (2016). However, while clarifying the circumstances where a petition's subjects are not mutually dependent, our modern jurisprudence provides little explanation for the reverse, i.e., the circumstances in which a petition's subjects are"mutually dependent."
"A constitutional amendment['s] ... 'words are to be given their natural and obvious sense according to common and approved usage at the time of its adoption.' " Mazzone v. Attorney Gen., 432 Mass. 515, 526, 736 N.E.2d 358 (2000), quoting General Outdoor Advertising Co. v. Department of Pub. Works, 289 Mass. 149, 158, 193 N.E. 799 (1935). A review of case law prior to and during the time that art. 48 was ratified demonstrates that, contrary to the court's interpretation, "mutually dependent" has a specific meaning distinct from "related." See, e.g., Ashley v. Three Justices of the Superior Court, 228 Mass. 63, 81, 116 N.E. 961 (1917).
The concept of mutual dependence as applied to legislation has its roots in the doctrine of severability. Whenever a court determines that a portion of a statute is unconstitutional, it must consider whether that portion is severable from the rest and determine whether the remainder of the statute may be left intact. Prior to 1854, many courts simply severed unconstitutional provisions from statutes, assuming that "full effect will be given to such as are not repugnant to the [C]onstitution." Bank of Hamilton v. Lessee of Dudley, 27 U.S. 2 Pet. 492, 526, 7 L.Ed. 496 (1829). See Shumsky, Severability, Inseverability, and the Rule of Law, 41 Harv. J. on Legis. 227, 232 (2004) (Shumsky); Stern, Separability and Separability Clauses in the Supreme Court, 51 Harv. L. Rev. 76, 79 (1937) (Stern).
However, Warren v. Mayor & Aldermen of Charlestown, 2 Gray 84, 99, 68 Mass. 84 (1854), was "particularly important to the development of modern severability doctrine," providing a "vexing exception" to the general rule permitting the severability of constitutional clauses from those held to be unconstitutional. Shumsky, supra at 233. See Stern, supra at 79-80. In Warren, the court held that the part of a State statute annexing Charlestown to Boston was invalid because it conditioned the annexation on the maintenance of representation in the Legislature in a manner that violated the Massachusetts Constitution. The court reasoned that the presumption of severability
**807 "must be taken with this limitation, that the [statute's] parts, so held respectively constitutional and unconstitutional, must be wholly independent of each other. [For] if they are so mutually connected with and dependent on each other, as conditions, considerations or compensations *330 for each other, as to warrant a belief that the legislature intended them as a whole, and that, if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional or connected, must fall with them" (emphasis added).
Warren, supra at 99. The court concluded that because the "various provisions of the act, ... all providing for the consequences of ... annexation, ... are connected and dependent[,] ... look to one object and its incidents, and are so connected with each other," the drafters and enactors of the legislation could not have intended the dysfunctional but constitutionally valid statutory remnant to stay in force and struck down the entire statutory enactment. Id. at 100, 107.
After 1854, the court sometimes simplified the language originally used in Warren to refer to portions of statutes that were not distinct and independent. Over time, the phrase originally expressed as "mutually dependent and connected" was sometimes expressed as "mutually dependent." See Ashley, 228 Mass. at 81, 116 N.E. 961 ; Nolan's Case, 122 Mass. 330, 332-333 (1877).
Thus, based on Warren and its progeny, "mutually dependent" subjects are those that, if separated from one another, would no longer convey the meaning or purpose of the proposition.[3] See Ashley, 228 Mass. at 81, 116 N.E. 961 ("the two parts are distinct and in their nature separable the one from the other and are not so interwoven and mutually dependent" [emphases added] ); Warren, 2 Gray at 100 ("various provisions of the act ..., all providing for the consequences of [another provision], more or less immediate or remote, are connected and dependent; the different provisions of the act look to one object and its incidents, and are so connected **808 with each other"). Each mutually dependent provision is reliant on the others to express its singular meaning. In other words, there is no way to separate the provisions in legislation with mutually dependent subjects and still have the law. See Commonwealth v. Petranich, 183 Mass. 217, 220, 66 N.E. 807 (1903) (provisions dependent where severance would mean "so chang[ing] the character of the original" legislation "that the [drafters and enactors] would not be presumed to have enacted [one provision] without the other").[4] *331 2. Mutual dependence in modern art. 48 case law. As discussed infra, in most of the cases interpreting art. 48's requirement that petitions contain only "subjects ... which are related or which are mutually dependent," the court has concluded that a petition met the relatedness test, and therefore has not necessarily discussed the mutual dependence prong. However, where the court has concluded that the petition does not meet either prong (and, therefore, cannot be asked of voters), it has either expressly or implicitly considered whether the petition "contains only subjects ... which are mutually dependent" in a manner consistent with the term as it was understood in 1917.
For example, in Gray, 474 Mass. at 648, 52 N.E.3d 1065, separately from our determination that the petition contained subjects that were not related, we analyzed whether it contained subjects that were mutually dependent:
"An initiative petition properly may contain only subjects 'which are related or which are mutually dependent.' Art. 48, The Initiative, II, § 3[, as amended by art. 74]. The two subjects in this petition are clearly not 'mutually dependent.'
**809 In fact, the opposite seems true. That is, whether the diagnostic assessment tests are based on the common core standards or some previous set of academic standards-the focus of sections 1 through 3 of the petition-will not affect in any way the commissioner's obligation under section 4 to release before the start of every school year all of the previous year's test items in order to inform educators about the testing process; the commissioner's obligation will exist independently of the specific curriculum content on which the tests are based."
The "exist independently" test is the same as the mutual dependence requirement from Warren and its progeny. See, e.g., Ashley, 228 Mass. at 81, 116 N.E. 961 (no mutual dependence where "the two parts are distinct and in their nature separable"); Petranich, 183 Mass. at 220, 66 N.E. 807 (one part of statute not dependent on another where other parts "may well stand independently of it").
In Carney v. Attorney Gen., 447 Mass. 218, 226, 850 N.E.2d 521 (2006), S.C., 451 Mass. 803, 890 N.E.2d 121 (2008), the court stressed that the relatedness limitation only "requires the Attorney General to scrutinize the aggregation of laws proposed in the initiative petition for its impact at the polls" (emphasis added). In other words, because each law in an "aggregation of [proposed] laws" could inherently "exist independently," Gray, 474 Mass. at 648, 52 N.E.3d 1065, the different proposed laws that make up the aggregation are not mutually dependent and therefore must be related in order to survive the two-prong test. See Massachusetts Teachers Ass'n v. Secretary of the Commonwealth, 384 Mass. 209, 218, 424 N.E.2d 469 (1981) (where it is obvious that there is packaging of independent proposals, proper question is whether those proposals are sufficiently related).
The court's conclusion that relatedness and mutual dependence are one and the same appears to stem partially from a misinterpretation of cases in which mutual dependence is not at issue.[5] In many cases where we concluded that a petition contained related subjects and therefore met the first prong of the two-pronged disjunctive *332 test, we used a "related subjects" or "relatedness requirement" heading. See, e.g., Dunn v. Attorney Gen., 474 Mass. 675, 679, 54 N.E.3d 1 (2016) ; Hensley v. Attorney Gen., 474 Mass. 651, 657, 53 N.E.3d 639 (2016) ; Abdow v. Attorney Gen., 468 Mass. 478, 498, 11 N.E.3d 574 (2014) ; Albano v. Attorney Gen., 437 Mass. 156, 161, 769 N.E.2d 1242 (2002) ; **810 Massachusetts Teachers Ass'n, 384 Mass. at 218, 424 N.E.2d 469.
The court did not evaluate the "mutually dependent" requirement in these cases; thus, the court should not look to these cases for an analysis of mutual dependence, nor should it assume that the two prongs mean the same thing. In Gray, supra at 644, 52 N.E.3d 1065, the court used the heading "relatedness" in analyzing the subjects in the petition before the court. There, whether the subjects were related was the operative question because the petition's provisions were plainly not mutually dependent, but instead, distinct and independent. Id. at 648, 52 N.E.3d 1065.
The same is true in Carney, where the court considered the "relatedness limitation" in art. 48 because the provisions of the petition were not mutually dependent. See Carney, 447 Mass. at 226, 850 N.E.2d 521 ("relatedness limitation requires the Attorney General to scrutinize the aggregation of laws proposed in the initiative petition for its impact at the polls" [emphasis added] ). The court's suggestion that we can read "or which are mutually dependent" out of the Constitution based on the headings in cases in which there was no need to discuss mutual dependence in any detail if at all is hazardous and has no jurisprudential support.
3. This petition "contains only subjects ... which are mutually dependent." The subjects in this one-section, four-sentence petition are mutually dependent because the subjects cannot be severed without changing the meaning of the petition. Cf. Warren, 2 Gray at 99-100. Standing alone, each provision means something different from the provisions together. Cf. id.
Attempting such a separation proves the point. It is possible to ask voters: "Should the people adopt a tax on incomes exceeding one million dollars?" But the remaining portions of the petition, regarding how the money should be spent, cannot stand on their own. See Gray, 474 Mass. at 648, 52 N.E.3d 1065 (rejecting petition after considering whether propositions could "exist independently"). What is left is a portion of a proposition regarding whether the people should dedicate some nonexistent revenue to education and transportation. This remaining partial proposition would not propose a "constitutional amendment" or "law," as required by art. 48, but instead would be no more than a policy question, which would not be a valid exercise of the legislative power under art. 48. See Paisner v. Attorney Gen., 390 Mass. 593, 601, 458 N.E.2d 734 (1983), citing Cohen v. Attorney Gen., 357 Mass. 564, 578, 259 N.E.2d 539 (1970) ("nonbinding expression of opinion ... [is] a plebiscite or declaration ... and is not an appropriate subject for the popular initiative").
**811 If the remaining partial proposition were to be refashioned so as to ask questions that would propose a "constitutional amendment" or "law," they would necessarily be different from the question presented by the petitioners. For example, questions regarding whether voters would like an additional amount of existing revenue (without a new source of revenue) to go toward education or to transportation, or both, would be entirely different from the one presented by the petitioners.
Similarly, separating the question so as to ask about two separate taxes, one to fund education and one to fund transportation, *333 also would fundamentally alter the question contained in the original petition. For example, rather than one four per cent tax to fund both education and transportation, the proposal could be severed to ask voters (1) whether to impose a two per cent tax on incomes over $1 million to fund education spending; and (2) whether to impose a separate two per cent tax on incomes over $1 million in order to fund transportation spending. Assuming both passed, the Legislature would not have the latitude accorded it by the original proposed law to spend on the two identified areas as it saw fit, and instead would be limited to spending the funds raised specifically for each area regardless of the particular needs in each area.
Thus, there is no way to separate the question into subjects and still have the same question-the petition does not have the same meaning if its subjects are separated. See Petranich, 183 Mass. at 220, 66 N.E. 807 (provisions dependent where severance would mean "so chang[ing] the character of the original statute that the [drafters and enactors] would not be presumed to have enacted [one provision] without the other"). As in Warren, 2 Gray at 100, the various provisions of the instant petition all "look to one object and its incidents." They are "mutually connected with and dependent on each other, as conditions, considerations or compensations for each other." Id. at 99. See Ashley, 228 Mass. at 81, 116 N.E. 961 ("the two parts are distinct and in their nature separable the one from the other and are not so interwoven and mutually dependent as to require the belief that the Legislature would not have enacted the one without the other"); Nolan's Case, 122 Mass. at 333, citing Warren, supra at 84 ("the two parts of this enactment are not distinct and independent, but ... are mutually dependent and must stand or fall together" [emphasis added] ).
The court relies on Edwards v. Bruorton, 184 Mass. 529, 69 N.E. 328 (1904), for the proposition that "the source of funds for a desired **812 public expenditure could be severed from the purpose of the expenditure." Ante at 321. However, a close reading of Edwards reveals that the opinion does not go that far. In Edwards, the court was called upon to determine the severability of parts of an 1891 special act. The act sought to "provid[e] for the expenditure of money for the benefit of the public" by granting the city of Boston the power to take land by eminent domain and to issue bonds for public works projects. Edwards, supra at 531, 69 N.E. 328. See St. 1891, c. 323, §§ 1-3, 10, as amended by St. 1892, c. 418, §§ 1, 5. The act also provided the city with the power to make an assessment on property abutting certain new road construction projects that could be spent to pay for the improvements. Edwards, supra. See St. 1891, c. 323, §§ 10, 14-17, as amended by St. 1892, c. 418, §§ 5, 7-10. The taxing provision had been held unconstitutional in an earlier case, and the court concluded that the remaining provisions could stand on their own, "leaving payment to be provided for in a constitutional way." Edwards, supra.
Unlike the provisions in the ballot question at issue in this case, a State's grant of powers to a municipality to take land, to float bonds, and to make special assessments on certain properties could plainly exist independently of one another. See Loeb v. Columbia Township Trustees, 179 U.S. 472, 489, 21 S.Ct. 174, 45 L.Ed. 280 (1900), cited in Edwards, 184 Mass. at 531, 69 N.E. 328 ("The power to issue bonds to raise the money, and the mode in which the township should raise the necessary sums to pay the bonds when due ... are distinct and separable matters" [emphasis added] ). In contrast, although one part of the instant petition (and the statute at *334 issue in Warren ) could stand alone, the remainder could not; the remainder acts only as a modifier, changing the meaning of that which could stand independently.[6]
Based on the language of the petition, rather than seeking to impose **813 a tax combined with the broad authority to spend the associated revenue on all areas of State government, the ballot initiative grants the Legislature with power to assess a particular tax and limits the areas where the revenue from that tax can be spent. The petitioners want to ask the electorate whether this question should be law, and the electorate has the right under art. 48 to consider whether this question should be law-not a different question.
4. The court's conflation of relatedness and mutual dependence in art. 48. Disregarding the second half of art. 48's requirement that a petition contain "only subjects ... which are related or which are mutually dependent," the court concludes that the subjects of the petition are unrelated, and thus holds that the ballot question cannot be put before voters.[7]
In explaining its view that "or which are mutually dependent" is surplusage,[8] the court stresses that "[t]he words ... were added at the last moment, when the 'related *335 subjects' language was 'referred back' to the committee on form and phraseology," **814 ostensibly to show that the addition was not given much thought. Ante at 319, quoting 2 Debates in the Massachusetts Constitutional Convention 1917-1918, at 953 (1918) (Constitutional Debates). Yet, as the chair of that committee explained when they released the draft, the changes were "made purely and simply to carry out what the committee believed to be the wishes of the Convention." Constitutional Debates, supra at 960 (remarks of Augustus P. Loring). Far from adding surplusage, that committee "cut down [by] about [fifteen] per cent" the text of the document. Id. at 959. "Unnecessary words were cut out," not put in. Id. at 960.
In redrafting the text, the committee on form and phraseology worked closely with those who had been active in the earlier debates, including the sponsor of the initiative and referendum, Joseph Walker, as well as Robert Luce and Josiah Quincy. Id. The Committee also worked closely with the advisor to the Convention, Lawrence B. Evans. Id. Evans explained that the role of that committee was to reduce "the amount of litigation which is due entirely to the careless drafting of constitutions or statutes." Evans, The Massachusetts Constitutional Convention, 11 Law. Libr. J. 51, 56 (1918). Evans explains that, instead of adding unnecessary words, the committee's role was to counter the insistence among delegates "who have not had the benefit of legal training and are afraid to trust the concise and exact language of the Committee" to insert "clauses which add nothing to the amendment except superfluous words." Id.
Our cases have explained that the requirement that a petition "contains only subjects ... which are related or which are mutually dependent" was put in place in order to limit the dangers of logrolling. See Dunn, 474 Mass. at 679, 54 N.E.3d 1 ; Carney, 447 Mass. at 227-229, 850 N.E.2d 521. Reasonable minds may disagree as to the precise definition of "logrolling"; however, based on the language of the constitutional text, we know that by enacting and ratifying art. 48, the delegates were concerned about the inclusion of multiple severable distinct, independent, and unrelated proposals combined together to be asked of voters together in one ballot question. See art. 48, The Initiative, II, § 3, as amended by art. 74. This written expression is consistent with the definition of "logrolling" that we have used in our cases, which also reference the **815 severability element,[9] as well as the understanding of the delegates who were concerned about logrolling.[10] *336 5. The court's relatedness analysis. The court's holding rests upon its conclusion that the subjects of the petition are not related, and correctly notes that our jurisprudence has similarly focused on relatedness rather than on mutual dependence. However, that is because, before now, each time that we have concluded that a ballot question was not in compliance with art. 48 because it failed to contain "only subjects ... which are related or which are mutually dependent," the petition comprised provisions that contained more than one proposition that could have been severed and "submitted separately" to be considered by voters without fundamentally altering the proposed laws. See Gray, 474 Mass. at 647, 52 N.E.3d 1065 ; Carney, 447 Mass. at 231-232, 850 N.E.2d 521 ; Opinion of the Justices, 422 Mass. 1212, 1221, 664 N.E.2d 792 (1996). Cf. Ashley, 228 Mass. at 81, 116 N.E. 961 ; Petranich, 183 Mass. at 220, 66 N.E. 807. In other words, the petitions were not mutually dependent, hence there was little, if anything, said about mutual dependence in our art. 48 cases.
a. Relatedness in art. 48 jurisprudence. For example, in **816 Carney, 447 Mass. at 219, 850 N.E.2d 521, the court considered whether a petition that (1) would prohibit dog racing in the Commonwealth and (2) would broaden criminal statutes penalizing dog fighting and neglect of dogs met the requirements of art. 48. These two sections of the petition are distinct and could be severed and asked of voters independently without altering their meanings: (1) whether the people should prohibit the practice of legalized dog racing and live betting, and (2) whether the people should broaden the criminal statutes penalizing animal abuse. See ibr.US_Case_Law.Schema.Case_Body:v1">id. The court referred to this as an "aggregation of these two very different sets of laws into one petition." Id. at 220, 850 N.E.2d 521. As the two subjects (in separate sections) were severable, i.e., not mutually dependent, the court analyzed the propositions to determine whether they were sufficiently related. Id. at 231, 850 N.E.2d 521. Determining that there was no operational relationship between the provisions and that the petition could not give voters a meaningful choice when voting yes or no, the court concluded that the severable propositions in the petition were not sufficiently related under art. 48, The Initiative, II, § 3, as amended by art. 74, and must be asked of voters separately. Id. at 231-232 & n.23, 850 N.E.2d 521.
Similarly in Gray, 474 Mass. at 638, 52 N.E.3d 1065, the court considered an initiative petition that concerned the use of certain educational standards in defining the educational curriculum of public school students and also concerned the standardized testing process used in school districts. The petition comprised six sections, many of which contained propositions that could have been severed and asked of voters separately. See id. at 641-643, 52 N.E.3d 1065. For example, at least two separate questions could have been asked without altering their meanings: (1) whether the people should repeal the "Common *337 Core" academic standard; and (2) whether the people should require the annual publication of all the previous year's questions, constructed responses, and essays included in mandatory standardized performance assessment tests. See ibr.US_Case_Law.Schema.Case_Body:v1">id. Here again, upon determining that the provisions were not mutually dependent, we analyzed whether they were nonetheless sufficiently related to be asked of voters together. See id. at 644-649, 52 N.E.3d 1065. We concluded that the first few sections ( sections 1 - 3 ), which essentially sought to rescind a vote of the Board of Elementary and Secondary Education and modify the process for developing and reviewing academic standards, were sufficiently related to a common purpose. Id. at 647, 52 N.E.3d 1065. However, the section requiring annual publication of test items (section 4) had a different purpose. **817 Id. at 647-648, 52 N.E.3d 1065. We thus determined that sections 1 - 3 and 4 were not sufficiently related to be asked of voters together; the petitioners were required to sever them and ask them of voters independently to satisfy the requirements of art. 48. Id. at 649, 52 N.E.3d 1065.
Finally, in Opinion of the Justices, 422 Mass. at 1213-1214, 1220, 664 N.E.2d 792, the court considered an initiative petition that would have (1) reduced compensation for members of the Legislature, (2) required that they receive all of their compensation in the first six months of any year, (3) tied future compensation to Massachusetts median household income, "(4) eliminate[d] or reduce[d] additional compensation for legislative leadership positions, ... (5) permit[ted] the State Auditor and Inspector General to oversee legislative financial accounts and purchasing activities," and (6) permitted the Inspector General to have oversight power over the commissioner of veterans' services.
Many of these propositions could have been severed from the others and asked of voters independently without changing their meanings, thus they were not mutually dependent. See id. For example, at least four separate questions could have been asked: (1) whether the people should reduce compensation for members of the Legislature; (2) whether the people should eliminate additional compensation for legislative leadership positions; (3) whether the people should permit the State Auditor and Inspector General to oversee legislative financial accounts and purchasing activities; and (4) whether the people should permit the Inspector General to oversee the commissioner of veterans' services. See id. Therefore, the court considered whether these separate questions were related to a common purpose. Id. at 1220-1221, 664 N.E.2d 792. The court concluded that, at the least, permitting the Inspector General to access the records of the commissioner of veterans' services was not related to legislative accountability and therefore the proposition regarding Inspector General oversight of the commissioner of veterans' services should have been severed from the petition's other propositions and asked of voters separately in order to be valid under art. 48. See id. at 1221, 664 N.E.2d 792.
Thus, although our case law has properly focused on relatedness, the tests articulated to determine whether the subjects of a petition are related need not be applied to this petition, which is not severable.[11]
*338 See art. 48, The Initiative, II, § 3, as amended by art. 74.
**818 b. The fairness inquiry. The fairness inquiry the court undertakes when it asks if it is fair to voters to be asked this question is part of the relatedness analysis. See Gray, 474 Mass. at 644-645, 52 N.E.3d 1065, quoting Carney, 447 Mass. at 226, 230-231, 850 N.E.2d 521. It attempts to answer the question: "Do the similarities of an initiative's provisions dominate what each segment provides separately so that the petition is sufficiently coherent to be voted on 'yes' or 'no' by the voters?" Gray, supra, quoting Carney, supra at 226, 850 N.E.2d 521. Any petition that cannot be severed into different questions (like this one) is inherently fair to be voted up or down because there is no other way to ask the question presented. Inherently, the "similarities of [the] initiative's provisions dominate what each segment provides separately" because, of the three "segment[s]" identified by the court, only the segment providing for a tax on high incomes separately "provide[s]" anything at all. See Gray, supra, quoting Carney, supra. The other two "segment[s]," if separated from the first, do not "provide" or stipulate anything; they are merely a condition modifying the consequences of the first segment. See Gray, supra, quoting Carney, supra. It is worth noting that, in fact, contrary to the court's conclusion regarding the "fairness" of asking this question to voters, the ballot question at issue here is no different from any proposal for a law; that is, it suggests a particular means to achieve a particular end.
Drafters of proposed laws (and constitutional amendments) designed to achieve goals (such as increasing spending on public investments) must choose a means by which to do so. Here the drafters chose a tax on incomes over $1 million. They could have chosen any number of other ways to reach this goal: alternative means to achieve a desired end in any proposed law are always available. If voters do not like the proposed means to achieve a particular end within a ballot question (or do not agree with the particular end proposed), they are, as always, free to vote against the question.
**819 Here, if opponents of the petition wish to achieve increased spending on education and transportation but dislike the proposed means, or wish to provide the Legislature with discretion to invest the revenue on more or fewer areas of public investment than education and transportation, they are free to express their opinion that voters should reject the question, just like in any other ballot question proposal. We should not stifle the policy debate by preventing the people from considering the petition altogether.
The court also suggests that the petition violates the spirit of logrolling because ballot questions seeking to amend art. 44's prohibition on a graduated income tax were defeated numerous times in the past (most recently in 1994).[12] In fact, art. 48 is designed to allow petitioners to modify a *339 previously rejected proposal, just as was done here, so that it might be more appealing to voters, provided that it meets art. 48's mode of origination requirements.
Although the requirement in art. 48, The Initiative, II, § 3, as amended by art. 74, that initiative petitions only contain "subjects ... which are related or which are mutually dependent" prohibits petitioners from tacking on an unrelated, distinct, independent and separate proposal for a law or constitutional amendment to their original proposal as part of one petition, art. 48 in no way prohibits petitioners from attempting to modify or limit a proposal with conditions until they are successful. In other words, if a majority of voters did not like a certain proposition because of its breadth, but a majority of voters would support the proposition if it were more limited, the more limited proposal may of course be asked.[13]
For example, a hypothetical gun safety advocacy group that advanced a previously rejected petition to outlaw automatic weapons could not return with a different petition that both outlawed automatic weapons and legalized recreational marijuana because **820 the two subjects are severable and unrelated. That same group, however, could advance a new petition to regulate (rather than prohibit) automatic weapons.
The court contends that this reading of mutual dependence would permit "any collection of provisions that would tax any number of different sources, and would provide funds to some indeterminate list of distinct entities and purposes, should be placed before voters, because the list of provisions would be 'mutually dependent.' " Ante at 325. This is a misunderstanding of mutual dependence. To the extent that a petition contained numerous distinct taxes, they would not necessarily be mutually dependent. Also, to the extent that a petition removed the Legislature's spending discretion, the provisions of this question would not likely be mutually dependent, but severable. Furthermore, the delegates to the 1917-1918 Constitutional Convention expressly considered and rejected the contention that the initiative petition process could be used to "provide funds to some indeterminate list of distinct entities," id., by including "specific appropriation[s]" on the list of matters excluded from the initiative process. Art. 48, The Initiative, II, § 2.
Article 48 permits the people to adopt laws through the initiative process that are properly narrowed to the popular will. To prohibit advocates from asking more limited propositions than others previously rejected by the people ignores the purpose of art. 48 and interferes directly with the democratic process.
6. Article 30 and the people's legislative power under art. 48. Finally, by ratifying art. 48, the people extended the legislative power from the General Court to the people. See art. 48, The Initiative, II; Bowe v. Secretary of the Commonwealth, 320 Mass. 230, 243-247, 69 N.E.2d 115 (1946) ; Horton v. Attorney Gen., 269 Mass. 503, 514, 169 N.E. 552 (1929). With the exception of a list of enumerated "excluded matters" expressly prohibited in Part II, art. 48 provides the people with broad authority to create laws.[14] See art. 48, The *340 Initiative, I, of the Amendments (art. 48 provides "the power of a specified number of voters to submit constitutional amendments and laws to the people for approval or rejection"). **821 "The principle of the initiative and referendum in its purity means that the people of this Commonwealth may have such laws and may have such a Constitution as they see fit themselves to adopt." Buckley v. Secretary of the Commonwealth, 371 Mass. 195, 199, 355 N.E.2d 806 (1976), quoting Constitutional Debates, supra at 16 (remarks of Joseph Walker). By citing Warren, the court acknowledges that the correct lens to look at mutual dependence is through severability. Ante at note 8. As mentioned supra, until now, in every case in which we have declared that a petition could not be submitted to the people, the provisions were severable and could be asked separately without changing the meaning of each provision.
By reversing the Attorney General's decision to certify the instant petition, the court fundamentally interferes with the ability of the people to exercise the constitutionally granted legislative power under art. 48. Because the proposed question is not severable, the effect of the court's holding is to turn art. 48's mode and form requirements into absolute disqualifiers; that is, rather than having the option of putting the question into what the court considers proper form, the question cannot be asked at all. See Horton, 269 Mass. at 514, 169 N.E. 552 ("The popular initiative relates to legislation.... The judicial department of government cannot interfere with the ordinary processes of legislation"). The court's opinion unduly operates to "deprive the people of a 'meaningful way' to express their will." Carney, 447 Mass. at 230, 850 N.E.2d 521.[15] I cannot support an interpretation that results in such an intrusion by the judicial power into the legislative power without a clearer expression in art. 48 providing the judicial department with that authority.
7. Conclusion. "[W]hether [the substance of this petition] is wise as a matter of economic and social policy is, of course, not subject to judicial review." Town Taxi Inc. v. Police Comm'r of Boston, 377 Mass. 576, 585, 387 N.E.2d 129 (1979).[16] The *341 court's holding overrides the Constitution's text, which limits matters excluded from **822 the initiative petition only to those thoughtfully and specifically enumerated under art. 48, The Initiative, II, § 2, and permits an initiative petition that "contains only subjects ... which are mutually dependent." art. 48, The Initiative, II, § 3, as amended by art. 74.
I see nothing in art. 48, The Initiative, II, § 3, as amended by art. 74, that prohibits the power of the people to accept or reject this ballot question in November; therefore, I dissent.

The dissent cites Warren v. Mayor & Alderman of Charlestown, 2 Gray 84, 100, 68 Mass. 84 (1854), for the proposition that " 'mutually dependent' subjects are those which, if separated from one another, would no longer convey the meaning or purpose of the proposition." Post at 330. This, however, too broadly construes the Warren court's view of mutual dependence. Only statutory parts which were "conditions, considerations or compensations for each other" could be deemed mutually dependent. Warren, supra at 99.

Without the "subjects ... which are related or which are mutually dependent" requirement, nothing would prohibit a group of petitioners from placing before the electorate the type of omnibus legislation that is commonly considered by the Legislature. As an example, on April 13, 2018, the Governor signed into law an omnibus criminal justice reform package sent to him by the Legislature. The law consists of 239 different sections. See St. 2018, c. 69. Among its numerous provisions, it repeals various mandatory minimum sentence requirements for certain crimes, including those relating to some retail drug offenses and drug paraphernalia. Id. at §§ 47-48, 55. At the same time, it expands mandatory minimum sentences for fentanyl and carfentanil trafficking. Id. at §§ 50-51. It also creates a Statewide sexual assault evidence kit tracking system. Id. at § 11. The bill includes numerous other provisions that could have been voted on separately but instead were packaged together for a single vote. It raises the minimum age a child can be tried in the Juvenile Court, §§ 77-79; reforms the drug-free school zone law, § 57; establishes a process for expunging criminal records, §§ 18, 104, 195; permits survivors of human trafficking to vacate convictions of certain crimes, § 132; limits the use of restrictive housing for prisoners, §§ 85-87, 93-94, 230, 236; prohibits prisons from unreasonably limiting in-person visits between prisoners and families, § 92; raises the felony threshold for malicious destruction of property, § 154; removes the penalty of license suspension from the offense of vandalism, § 152; requires the availability of high school equivalency certificate programming to inmates, § 95; and requires prisons to provide reentry preparation programming at least six months before prisoners' release date, § 93.

Excluded matters under art. 48 include measures that "relate[ ] to religion, religious practices or religious institutions; or to the appointment, qualification, tenure, removal, recall or compensation of judges; or to the reversal of a judicial decision; or to the powers, creation or abolition of courts; or the operation of which is restricted to a particular town, city or other political division or to particular districts or localities of the commonwealth; or that makes a specific appropriation of money from the treasury of the commonwealth" and matters relating to art. 18 of the Amendments to the Massachusetts Constitution, art. 48 itself, provisions in the Constitution specifically excluding matters from popular initiative and referendum, and certain rights in the Massachusetts Declaration of Rights. Art. 48, The Initiative, II, § 2.

The court cites to Warren v. Mayor & Alderman of Charlestown, 2 Gray 84, 99, 68 Mass. 84 (1854), signaling that it understands the relationship between the severability of portions of statutes deemed to be unconstitutional, and the term "mutually dependent" in art. 48. However, its application of the case is flawed. As explained infra, Warren supports the conclusion that all aspects of the instant petition are mutually dependent.

The regular use of the term "mutually dependent" by courts to describe severability of statutes at the time of the 1917-1918 Constitutional Convention alone is sufficient to connect the term as used in art. 48 with the debates among the delegates regarding the danger of combining of numerous unrelated, distinct, and independent proposals into a single ballot question for an up or down vote. However, it is interesting to note that this court applied the "mutually dependent" test to determine if provisions of a statute were severable in an opinion that was released during the Constitutional Convention. See Ashley v. Three Justices of the Superior Court, 228 Mass. 63, 66, 116 N.E. 961 (1917). Further, John W. Cummings, who represented the petitioner in the Ashley case, was also the chair of the Constitutional Convention's committee on initiative and referendum. 2 Debates in the Massachusetts Constitutional Convention 1917-1918, at ix, 2 (1918) (Constitutional Debates). As chair of that committee, he would have played a major role in seeing the written expression of what would become art. 48 through the Constitutional Convention's proceedings.

The court's conflation of relatedness and mutual dependence is discussed further, in part 4, infra.

To the extent that the reasoning in Edwards v. Bruorton, 184 Mass. 529, 69 N.E. 328 (1904), is inconsistent with the reasoning of Warren, the inconsistency may be explained by the context in which Edwards was decided. At the time of Edwards, many States had authorized cities to make public improvements, engage in planning, and, on occasion, tax abutters in a manner later determined to be unconstitutional, to help pay for street improvements. See, e.g., Loeb v. Columbia Township Trustees, 179 U.S. 472, 489, 21 S.Ct. 174, 45 L.Ed. 280 (1900). When the same statute made such an assessment and also provided the authority to float bonds to pay for infrastructure projects, many courts first concluded that all of these provisions were mutually dependent. See, e.g., Loeb v. Trustees of Columbia Township, Hamilton County, Ohio, 91 F. 37, 45 (S.D. Ohio 1899). See also Loeb, 179 U.S. at 489, 21 S.Ct. 174 ("There is some ground for saying that the legislature would not have passed the act without the [assessment] section").
The Edwards court acknowledged that its decision in the case regarding mutual dependence was "not free from difficulty," Edwards, 184 Mass. at 533, 69 N.E. 328, and described the case as one "present[ing] difficulties of determination upon the question," id. at 531, 69 N.E. 328. However, the court ultimately followed the reasoning of the United States Supreme Court and concluded that the assessment provisions were not mutually dependent on the power to take land and the power to issue bonds. Id., citing Loeb, 179 U.S. 472, 21 S.Ct. 174, 45 L.Ed. 280. In the intervening thirteen years between the enactment of the statute and the court's conclusion that a special benefit assessment was unconstitutional, the city of Boston would have issued many bonds and taken many parcels of land from property owners. Had the court concluded, years later, that all of the provisions of the 1891 special act, as amended, were invalid, the transactions would have been difficult if not impossible to undo. See Loeb, supra at 488-489, 21 S.Ct. 174 ; A. Scalia & B.A. Garner, Reading Law: The Interpretation of Legal Texts 66 (2012) (Scalia & Garner) (describing presumption of validity as one that "disfavors interpretations that would nullify the provision or the entire instrument-for example, an interpretation that ... would cause a statute to be unconstitutional"). Similar considerations are not present in considering whether the provisions of Initiative Petition 15-17 are mutually dependent.

The court asserts that this test in art. 48 does not "impose a separate requirement that may be satisfied even if the subjects of a petition are not related." Ante at ----. Nonetheless, the court asserts that the provisions of the petition are not mutually dependent. Ante at 318.

This view ignores a basic tenet of statutory interpretation that every word is to be given effect and none should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence. Scalia & Garner, supra at 174.

" 'Logrolling' ... is defined as '[t]he legislative practice of including several propositions in one measure or proposed constitutional amendment so that the legislature or voters will pass all of them, even though these propositions might not have passed if they had been submitted separately' " (emphasis added). Carney v. Attorney Gen., 447 Mass. 218, 219 n.4, 850 N.E.2d 521 (2006), quoting Black's Law Dictionary 960 (8th ed. 2004). See Dunn v. Attorney Gen., 474 Mass. 675, 679, 54 N.E.3d 1 (2016) (same); Abdow, v. Attorney Gen., 468 Mass. 478, 502 n.19, 11 N.E.3d 574 (same).
"Logrolling" has also been defined as "the practice of several minorities combining their several proposals as different provisions of a single bill and thus consolidating their votes so that a majority is obtained for the omnibus bill where perhaps no single proposal of each minority could have obtained majority approval separately" (emphasis added). Ruud, No Law Shall Embrace More Than One Subject, 42 Minn. L. Rev. 389, 391 (1958). Ruud contended that, in States that have single subject rules, "[t]he disposition of money raised by a tax or fee is clearly germane to the subject of the tax and so is an appropriation to administer the tax." Id. at 428, citing Winter v. Barrett, 352 Ill. 441, 186 N.E. 113 (1933).

See, e.g., Constitutional Debates, supra at 537 (remarks of Francis N. Balch) (suggesting that there be special body to review ballot questions for seven different requirements as to proper form, including one stating that "[t]he measure touches only one subject-matter, or on subject-matters so related as not fairly to require separation" [emphasis added] ). Furthermore, it is consistent with the examples given by delegates concerned about logrolling such as the Oregon example provided by Robert Luce. Id. at 567 (discussing "a case in Oregon, where, in order to secure the passage of the single tax, there was hitched to the front of it, like a locomotive to the front of a freight train, a proposal that there should be no more poll or head taxes").

I take no position whether the subjects of the petition are related, except to note that subjects can be both related and mutually dependent. See Massachusetts Teachers Ass'n v. Secretary of the Commonwealth, 384 Mass. 209, 218 n.8, 424 N.E.2d 469 (1981) ("We need not pause to consider whether any subjects which are mutually dependent could ever be said not also to be related"). Further, the question whether subjects are related is often a subjective one. See Dunn, 474 Mass. at 680, 54 N.E.3d 1 ("there is no single 'bright-line' test for determining whether an initiative meets the related subjects requirement"); R. Luce, Legislative Procedure 551 (1922) (discussing difficulty in interpreting single subject rules and noting that "[p]erhaps our language does not permit a more accurate statement of what is meant"); Cooter & Gilbert, A Theory of Direct Democracy and the Single Subject Rule, 110 Colum. L. Rev. 687, 709-712 (2010).

This view ignores the canon of statutory interpretation providing that a "determination of statutory meaning [cannot] be overridden by a judicially perceived, at-large 'spirit' of the law that overcomes its letter." Scalia & Garner, supra at 343.

The court's opinion appears to allow a ballot question permitting a graduated income tax to be asked of voters alone such that any associated revenue would be available for legislators to spend on all areas of government spending. But by the court's logic, a question that called for the same tax but enumerated each area of government spending in the text would violate art. 48 because it would contain "unrelated subjects" despite the fact that it would be fundamentally the same question with the same outcome.

In fact, the Constitutional Convention's decision to move the requirement that a petition contain "only subjects ... which are related or which are mutually dependent" to the "Mode of Originating" section, art. 48, The Initiative, II, § 3, as amended by art. 74, and away from the "Excluded Matters" section reflects the conscious intent that the provision was not designed to prohibit certain proposed laws from being asked of voters. Constitutional Debates, supra at 960; Convention Doc. No. 370, at 2-3.

Although the delegates at the 1917-1918 Constitutional Convention expressly rejected a single subject rule, instead opting for a rule requiring there to be "related" or "mutually dependent" subjects, the court's opinion is written as if our Constitution does in fact provide a single subject rule. See Massachusetts Teachers Ass'n, 384 Mass. at 220, 424 N.E.2d 469.

It is well worth noting that at the time of the debates over art. 48, many proponents of the initiative and referendum favored it because it would let voters vote on the exact type of question being posed by the ballot question in this case, and opponents opposed it for that same reason. However, the opponents lost. Albert E. Pillsbury was one of the most hard-line opponents of the initiative and referendum provisions. Pillsbury viewed the debate as "between the believers in constitutional representative government on the one hand and socialistic democracy on the other." Constitutional Debates, supra at 604. He believed that "[t]he ultimate effect if not the object of the initiative and referendum, say what you will, is to enable a majority at the polls to appropriate the property of those who have it to the use of those who want it. With this weapon in their hands they can do ... anything." Id. at 613.
On the other side of the issue was Grenville S. MacFarland, an editorial writer for the Boston American, who was once referred to as "the most influential force for the [initiative and referendum provisions]." R.L. Bridgman, The Massachusetts Constitutional Convention of 1917, at 42 (1923). MacFarland sent a personal letter to all candidates for the Legislature expressing concerns about economic inequality in the industrial era:
"In my judgment, and I hope in yours, that convention will be a failure if it does not enable us to obtain the initiative and referendum by which the direct power of the whole body of citizens may supplement the present form of representative government and keep it free from those vices which the unequal distribution of wealth and the resulting concentration of financial and political power, through the rise of powerful public service and industrial corporations, have introduced into our body politic and are now threatening our representative form of government."
Id. at 42-43.